**T.V. SPANO BUILDING CORPORATION, Appellant Below, Appellant,**

v.

**The DEPARTMENT OF NATURAL RESOURCES AND ENVIRONMENTAL CONTROL and Edwin H. Clark, II, Secretary, Appellees and Cross–Appellants Below, Appellees, Cross–Appellants,**

v.

**Thomas V. SPANO, Cross–Appellee Below, Cross–Appellee.**

Supreme Court of Delaware.

Submitted: June 1, 1993.
Decided: July 30, 1993.

---

Richard D. Allen (argued), and Karen L. Pascale, Morris, Nichols, Arsht & Tunnell,

Wilmington, for appellant T.V. Spano Bldg. Corp. and cross-appellee Thomas V. Spano.

Kevin P. Maloney (argued), and David Lewis Ormond, Jr., Dept. of Justice, Wilmington, for appellees and cross-appellants the Dept. of Natural Resources and Environmental Control and Edwin H. Clark, II, Secretary.

Before VEASEY, C.J., HORSEY, MOORE, WALSH and HOLLAND, JJ., constituting the Court en Banc.

VEASEY, Chief Justice:

Before the Court is an appeal from an order of the Superior Court affirming a decision of the Environmental Appeals Board (the "Board") holding that organic matter and other construction debris constituted hazardous waste within the meaning of the Hazardous Waste Management Act, 7 *Del.C.* § 6301 *et seq.* (the "Act") when disposed of under the circumstances of this case. We concur with that holding and the determination that Appellant, T.V. Spano Building Corporation ("TVSBC"), a Pennsylvania corporation, is liable for emergency remediation. We also hold that the determination of the Board, affirmed by the Superior Court, that Thomas V. Spano ("Spano"), president of TVSBC, is not personally liable for improperly disposing of such waste is supported by substantial evidence and is consistent with applicable law. In addition, we find that the cross-appeal was timely filed in the Superior Court. Accordingly, we AFFIRM the judgment of the Superior Court.

## I. FACTS

### A. Site Preparation

TVSBC is the developer of a residential community known as Raintree Village ("Raintree"). The Raintree property, located in White Clay Hundred, New Castle County, Delaware, was purchased by TVSBC and Concord 2 Associates, Inc., in 1985. The following year, TVSBC employed various subcontractors to prepare the Raintree property for the construction phase of development. In particular, TVSBC retained DiSabatino Brothers, Inc. ("DiSabatino"), to clear trees, brush, vegetation and other organic matter ("pre-construction debris") from the building site. DiSabatino was also responsible for disposing of the pre-construction debris and for grading the site.

A pre-construction meeting attended by the staff of TVSBC (but not Spano personally), DiSabatino, and the New Castle County Department of Public Works ("County") was held on April 4, 1986. At that time the developers proposed to dispose of the pre-construction debris in trenches located in the right-of-way owned by Delmarva Power & Light Company ("DP & L"), which right-of-way ran through the middle of the development. Preparation of the site commenced following the County's approval of the plan. Pursuant to the plan, tree stumps, tree limbs, and other vegetation were cleared from the site and buried in the trenches. A small quantity of construction debris, including wood, plywood, empty paint cans, and joint compound containers was also buried in the trenches. The debris was then covered with a layer of earth primarily consisting of clay. Spano visited the Raintree site at least once or twice each week throughout this phase of the project and he personally viewed the disposal trenches and their contents.

Although Spano was a corporate officer who had broad authority for the Raintree project and direct knowledge of the disposal trenches, he had no direct control or involvement in the actual decision to dispose of the pre-construction debris, and there is no evidence in the record which suggests that Spano ratified or otherwise approved of the disposal plan. That decision was made by TVSBC's attorneys, DiSabatino,[1] the County, and members of TVSBC's staff, excluding Spano.

---

1. DNREC asserts that DiSabatino was an agent of Spano, and therefore Spano is liable for the actions of DiSabatino. The facts clearly show that DiSabatino was an agent of TVSBC, not of Spano personally, and acted solely at the direction of TVSBC, not Spano.

## B. Discovery of Methane

On September 24, 1987, following the construction of various streets and approximately forty-five homes, the local fire department and the State Emergency Response Team were called to the development to investigate an apparent flash ignition that occurred in the sump of a home located on Jonathan Drive. Thereafter, the Delaware Department of Natural Resources and Environmental Control (DNREC") and the United States Environmental Protection Agency ("EPA") commenced an investigation to determine the cause and source of the flash ignition. Tests revealed that the flash ignition was caused by methane gas, which was detected in several of the Raintree homes at a concentration of one-hundred percent of the lower explosive limit ("LEL").[2] In response, ventilation systems were installed in the affected homes to prevent gas build-ups and explosions.

Additional tests revealed that the debris buried in the DP & L right-of-way was the source of the methane gas. Methane is a naturally occurring gas that is created by the decomposition of organic material, such as tree stumps and limbs, in a moist, anaerobic environment.[3] As the organic material is digested by micro-organisms, methane is produced as a by-product. In the present case, the methane gas travelled laterally through the ground, rather than dissipating into the atmosphere because the trenches were capped with soil containing a high clay content. The Board found that sewage from an old sewage line had seeped from the line and interacted with the construction waste. The sewage did not cause the breakdown of the construction waste into methane, but it merely increased the rate at which the process occurred. According to these findings, the construction waste would have decomposed into methane gas and created the hazardous situation regardless of the presence of the sewage, but the sewage caused the decomposition to happen more rapidly.

## C. Administrative Action and First Board Hearing

Pursuant to 7 *Del.C.* § 6308, the Acting Secretary of DNREC (the "Secretary") issued an order containing findings of fact, and directed TVSBC and Spano to address the methane gas situation. Specifically, TVSBC and Spano were ordered to hire a consultant, and pursuant to Section 6308, to reimburse DNREC for expenses incurred in the emergency remediation of the site. TVSBC and Spano appealed the imposition of emergency costs to the Board. Finding that the pre-construction debris was hazardous waste, the Board affirmed DNREC's order. The Board, however, reversed DNREC's imposition of personal liability on Spano, finding that "[a]lthough Mr. Spano personally oversaw [the overall Raintree project], he did so in his capacity as an officer of [TVSBC]." The Board failed, at that time, to make more specific findings regarding Spano's personal liability.

## D. First Appeal to Superior Court

Both TVSBC and DNREC appealed the Board's decision. On appeal, the Superior Court affirmed the Board's interpretation of hazardous waste and the imposition of liability on TVSBC for the cost of the emergency remediation. The issue of Spano's personal liability was remanded to the Board because its findings "evidence[d] a lack of understanding of the liability of corporate officers ... for wrongful actions in which they took part...." *T.V. Spano Building Corp. v. Wilson*, Del.Super., 584 A.2d 523, 530 (1990).

## E. Second Board Hearing and Second Appeal to Superior Court

Consistent with the Superior Court's instructions, the Board permitted TVSBC and

---

**2.** LEL is the minimum amount of a substance necessary to cause an explosion.

**3.** During subsequent excavation and analysis of the disposal trenches, DNREC, EPA, and a consultant determined that the trenches were located in a low lying, moist area, and that the disposal trenches specifically contained the previously named organic matter and construction debris.

Spano to introduce new evidence regarding their liability for the emergency remediation. After reviewing the additional evidence, the Board once again concluded that TVSBC is properly liable for the costs of the emergency remediation. Again, the Board held that Spano was not jointly liable with TVSBC because he did not exercise the requisite degree of personal control over the disposal of the pre-construction debris.

TVSBC and DNREC subsequently appealed the Board's findings to the Superior Court. DNREC cross-appealed on the issue of Spano's personal liability. TVSBC appealed the finding that it was liable, and further argued that DNREC's cross-appeal was not timely. The Superior Court affirmed the Board's findings of fact and conclusions of law, and further found DNREC's cross-appeal to be timely. The present appeal followed.

## II. THE CROSS–APPEAL OF DNREC WAS FILED TIMELY.

■ Spano contends that the Superior Court erred in ruling that DNREC and Edwin H. Clark, II, Secretary, timely filed their cross-appeal in that court. Such asserted errors of law are reviewed *de novo* by this Court. *Fiduciary Trust Co. v. Fiduciary Trust Co.*, Del.Supr., 445 A.2d 927, 930 (1982). Super.Ct.Civ.R. 72(h) states in pertinent part that a "notice of cross-appeal shall be filed within 10 days after the date on which the first notice of appeal was filed." TVSBC filed its notice of appeal from the Board's second order on February 7, 1992. DNREC filed its notice of cross-appeal against Spano on February 22, 1992. Accordingly, Spano contends that because DNREC had until only February 17, 1992, to file its cross-appeal under Rule 72(h), the Superior Court lacked jurisdiction to hear it.

DNREC, however, did not receive the notice of TVSBC's appeal until February 20, 1992. If this Court were to apply Rule 72(h) literally, DNREC would have had to file its cross-appeal before it received notice that TVSBC appealed the Board's decision. Such a holding would produce an unreasonable result, and this Court may reject such an interpretation in favor of one which will produce a more reasonable result. *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, Del.Supr., 492 A.2d 1242, 1247 (1985). In addition, the Delaware Administrative Procedures Act, which applies to actions of the Board, states that "[n]o petition, appeal or other application for relief of the Court shall be considered as having been taken or made until it has been filed with the Prothonotary *and served upon the agency* in accordance with the rules of the Court." 29 *Del.C.* § 10145 (emphasis added); 29 *Del.C* § 10161(9).

■ When read in conjunction with 29 *Del.C.* § 10145, Rule 72(h) implies that the ten-day limitations period does not begin to run against an agency subject to the Delaware Administrative Procedures Act until the petition, appeal, or other application has been filed with the Prothonotary and until the agency receives notice of the appeal. We find that DNREC had ten days from the date upon which it received notice of the appeal, or until March 2, 1992, to file its cross-appeal. DNREC filed its cross-appeal on February 25, 1992, well within the ten-day period. We hold that DNREC's cross-appeal was timely filed and that the Superior Court had jurisdiction over the matter.

## III. THE BOARD DID NOT ERR IN DETERMINING THAT VEGETATIVE AND CONSTRUCTION DEBRIS CONSTITUTED HAZARDOUS WASTE UNDER 7 *DEL.C.* § 6302(7).

TVSBC contends that it may not be held liable under 7 *Del.C.* § 6308(4) for expenses DNREC incurred in remediating the Raintree site.[4] This

---

**4.** Section 6308 of the Hazardous Waste Management Act states in pertinent part:

[T]he Secretary, upon receipt of information that the ... disposal of any hazardous waste may present an imminent and substantial hazard to the health of persons or to the environment, may take such action as he determines to be necessary to protect the health of such

assertion[5] is premised on the argument that organic matter which does not demonstrate hazardous characteristics and is not specifically listed as a hazardous substance may not be classified as a hazardous waste under the Act. We find this contention to be without merit.

There are essentially three methods by which a solid waste may be classified as hazardous. First, it may be defined as a hazardous waste by operation of 7 *Del.C.* § 6302(7) which provides:

> "Hazardous wastes" means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical or chemical characteristics may cause or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating irreversible illness, or pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported or disposed of, or otherwise managed.

Second, hazardous waste is any waste which exhibits certain characteristics listed in the regulations pursuant to 7 *Del.C.* § 6305(a)(1)(a)(b). This type of hazardous waste is known as "characteristic" hazardous waste, and displays any one or all of the following traits: ignitability, corrosivity, reactivity, or toxicity. and satisfies the definitional requirements of § 6302(7). Delaware Regulations Governing Hazardous Waste, §§ 261.21.24, § 261.10. Finally, a specific substance may be expressly listed as hazardous waste by the Secretary. Delaware Regulations Governing Hazardous Waste, §§ 261.30–261.33. This type of waste is known as "listed" hazardous waste.

■ Generally, hazardous waste is a subset of solid waste. 7 *Del. C.* § 6302(7). Solid waste is defined as, among other things, any "refuse." 7 *Del.C.* § 6302(12).

*See also* 7 *Del.C.* § 6402(9). The regulations further define refuse as "any putrescible or nonputrescible solid waste ... including ... construction wastes." Delaware Regulations Governing Solid Waste, § 3 (1988). The term "construction waste" is undefined by the regulations, but this Court has held that undefined words will be given their ordinary, common meaning. *See Coastal Barge Corp.*, 492 A.2d at 1245. The ordinary, common usage of "construction waste" logically includes any debris which normally results from the process of developing or improving real property. The waste disposed of at the Raintree site included vegetation, tree stumps, tree limbs, plywood, empty paint cans, and joint compound containers. Such refuse is commonly associated with construction and, therefore, constitutes "construction waste." It is apparent from the foregoing discussion that the refuse in question is a solid waste, therefore satisfying the first element of the hazardous waste definition.

■ The record demonstrates that the construction waste at the Raintree site neither exhibited the hazardous characteristics defined by the regulations, nor appeared on DNREC's list of hazardous substances. Delaware Regulations Governing Hazardous Waste, §§ 261.21–261.24, 261.-30–261.33. Thus, the construction waste in the present case cannot be classified as "characteristic" or "listed" hazardous waste under the Regulations. TVSBC therefore contends that "trees and shrubs do not constitute hazardous waste under the Regulations ...," and thus DNREC has no authority to implement emergency remediation measures under 7 *Del.C.* § 6308(4).[6] On the basis of these findings alone, TVSBC claims it cannot be held liable for improperly disposing of hazardous

persons or the environment. The action the Secretary may take includes, but is not limited to: ... (4) Directing Department personnel to undertake emergency cleanup and remedial measures. The Secretary may recover the costs of such measures from the responsible party.

5. This is the only issue on appeal regarding TVSBC's liability. The issues of whether an

"imminent and substantial hazard" existed at the Raintree site, and whether TVSBC is a "responsible party" have been previously determined, and are not at issue in this case. *T.V. Spano Bldg. Corp. v. Wilson,* Del.Super., 584 A.2d 523 (1990).

6. Delaware regulations mirror the federal regulations.

waste under the Act.[7] TVSBC correctly observes that the construction waste is not specifically designated under all circumstances to be hazardous waste under the regulations, but TVSBC fails to acknowledge that construction waste may constitute hazardous waste under certain circumstances. Pursuant to the definition, solid waste may become hazardous by being mixed with other solid wastes, or because of its quantity, concentration, physical characteristics, or chemical characteristics. 7 *Del.C.* § 6302(7). The use of the disjunctive in the statute makes it clear that solid waste need exhibit only one of the characteristics to be classified as hazardous. The record plainly demonstrates that the quantity, concentration, physical characteristics, and chemical characteristics of the construction debris produced methane gas when exposed to the conditions present in the disposal trenches.

The statute further requires that the waste "cause or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating irreversible illness, or pose a substantial present or potential hazard to human health or the environment...." *Id.* The waste need not satisfy all of the factors. Rather, the waste need satisfy only one of the factors to be classified as hazardous waste. *Id.* In this case, the Board found the construction waste posed an imminent and substantial present hazard to human health because its decomposition·produced methane gas. This gas accumulated in the base-

ments of several homes thereby exposing the residents to an extreme risk of bodily harm from explosion.

The waste was found to pose "a substantial present or potential hazard to human health or the environment ...," but an additional requirement must be satisfied for waste to be considered hazardous.[8] 7 *Del.C.* § 6302(7). Specifically, the waste must become hazardous when improperly treated, stored, transported, disposed of, or otherwise improperly managed. *Id.* Because the statute uses the disjunctive, the classification is triggered when only one of the requisite factors is present. *Id.* Nonetheless, the factor must be coupled with the modifying act of its being improper. *Id.*

While the Act does not define the phrase "disposed of," this Court will apply the ordinary common meaning. *Coastal Barge*, 492 A.2d at 1245. Something is "disposed of" when it is discarded or thrown away. *See Webster's Third New International Dictionary* 654 (1986). In this case, it is clear that TVSBC "disposed of" the pre-construction debris when it deposited the waste into the disposal trenches. The developer's objective intent to "dispose of" the waste is illustrated by the expense and effort spent to submerge and permanently landfill the construction debris. Such efforts are inconsistent with any intention other than disposing of the waste.

---

7. TVSBC further asserts that we should adopt the findings of the United States District Court for the District of Delaware, and hold that construction waste is not hazardous waste. *Joseph J. Gallagher v. T.V. Spano Bldg. Corp.*, 805 F.Supp. 1120 (D.Del.1992) (ORDER). In that case arising from the same operative facts, the court held that construction waste is not hazardous waste within the meaning of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.* (1988). We note that the main purpose of CERCLA is to remediate environmental damage *after* it has occurred. *Id.* The Delaware Hazardous Substance Cleanups Act, 7 *Del.C.* §§ 9101–9120, is similar to CERCLA, but, this case is not proceeding under that statute. This case is brought under the Delaware Hazardous Waste Management Act and the Delaware Environmental Control Act, the purposes

of which are to *prevent* environmental damage. 7 *Del.C.* §§ 6001, 6301. The Delaware statutory scheme employs the same structure and much of the same language as the federal Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq.* (1988), in Subchapter I regulating hazardous waste. *Compare, e.g.,* 7 *Del.C.* § 6308 (regarding imminent hazard) *with* RCRA, 42 U.S.C. § 6973 (regarding imminent hazard). Therefore, any analogy to CERCLA *in this litigation* is misplaced and unpersuasive.

8. This additional requirement need not be satisfied if the waste is considered hazardous under some other part of this definition. 7 *Del.C.* § 6302(7). DNREC may, however, impose this requirement when it promulgates regulations. Delaware Regulations Governing Hazardous Waste, § 261.10.

Furthermore, TVSBC improperly disposed of the waste. Section 6025(a) of the Environmental Control Act, 7 *Del.C.* § 6001 *et seq.*, empowers DNREC to promulgate regulations regarding the disposal of solid waste. Both the regulations and the statute require a party to obtain a permit for the disposal of solid waste unless the party is exempted from the operation of the Act. 7 *Del. C.* § 6025(b); Delaware Regulations Governing Solid Waste § 2(C). Because the construction debris is solid waste, and TVSBC is not exempted by operation of the statute or the regulations, a permit was required to dispose of the waste. *Id.* The record indicates that TVSBC did not obtain the required permit. Accordingly, TVSBC violated the Act and Regulations and improperly disposed of the construction waste.[9]

■ We hold that the solid waste TVSBC disposed of in the trenches is hazardous waste within the meaning of 7 *Del.C.* § 6302(7) because its quantity, concentration, physical characteristics, or chemical characteristics pose a substantial present hazard to human health. The debris generated methane gas which exposed the residents of Raintree to an imminent and substantial hazard of explosion. Accordingly, TVSBC is liable for the cost of the emergency remediation. 7 *Del.C.* § 6308(4).

## IV. ALTHOUGH A CORPORATE OFFICER MAY BE HELD PERSONALLY LIABLE FOR CIVIL DAMAGES UNDER 7 *DEL.C.* § 6308, SPANO IS NOT LIABLE IN THIS INSTANCE.

### A. Test of Liability

DNREC next contends that a corporate officer may be held liable under 7 *Del.C.* § 6308(4) for improperly disposing of hazardous waste. Section 6308 states in pertinent part:

Notwithstanding any other provision of this chapter, the Secretary, upon receipt of information that the ... disposal of any hazardous waste may present an imminent and substantial hazard to the health of persons or to the environment, may take such action as he determines to be necessary to protect the health of such persons or the environment. The action the Secretary may take includes, but is not limited to ... (4) Directing Department personnel to undertake emergency cleanup and remedial measures. The Secretary may recover the costs of such measures from the responsible party....

DNREC's argument is premised on the proposition that the meaning of the phrase "responsible party" is consistent with the statutory definition of the term "person" in 7 *Del.C.* § 6302(10), and that common law tort principles, as well as persuasive federal common law, include officers, directors, or employees within the meaning of the term.

■ The term "responsible party" is undefined by the statute; we will therefore apply its common, ordinary meaning. *Coastal Barge*, 492 A.2d at 1245. We find the common, ordinary meaning of "responsible party" to be a "person" who causes DNREC to take emergency remedial action resulting from the storage, transportation, treatment, disposal, or otherwise improper management of a hazardous waste. Section 6302(10) defines a "person" as "an individual, trust, firm, joint stock company, federal agency, corporation (including a government corporation), partnership, association, state, municipality, commission, political subdivision of a state or any interstate body." 7 *Del.C.* § 6302(10). Although the definition does not specifically mention officers of a corporation, the definition is broad enough to include a corporate officer as a responsible party under Section 6308(4) under certain circumstances.[10]

9. Only the State through DNREC is empowered to grant solid waste disposal permission. 7 *Del.C.* § 6025. The statute and the regulations are widely available, and thus TVSBC was on notice that any assurances made by the County applied only to County requirements, and in no way affected TVSBC's duties under 7 *Del.C.* § 6025.

10. We need not decide whether or not corporate directors, employees, or agents may likewise be held personally liable.

Federal decisional law interpreting the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6992k (1990), also holds that responsible corporate officers may be held personally liable for the improper disposal of hazardous waste. *United States v. Northeastern Pharmaceutical,* 810 F.2d 726 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *United States v. Production Plated Plastics, Inc.,* 742 F.Supp. 956 (W.D.Mich.1990), *opinion adopted by,* 955 F.2d 45 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992); *United States v. Conservation Chemical Company of Illinois, Inc.,* 733 F.Supp. 1215 (N.D.Ind.1989); *United States v. Conservation Chemical Company of Illinois, Inc.,* 660 F.Supp. 1236 (N.D.Ind.1987). Delaware has undertaken the management of hazardous waste with a comprehensive plan that directly parallels the federal enactments on this subject. *See* 7 *Del. C.* §§ 6301–6319; 42 U.S.C., Subchapter III, §§ 6921–6939b (1990). In fact, much of the language and structure of the Delaware Act and the regulations through which it is implemented, Delaware Regulations Governing Hazardous Waste (1992), are similar to those in the federal act and its implementing regulations, 40 C.F.R. §§ 260–272 (1992).

▮ In our view, the General Assembly intended to impose personal liability under the Act in appropriate circumstances on corporate officers who improperly dispose of hazardous waste. This intent is apparent in the Findings and Purpose section of the Act, 7 *Del. C.* § 6301. Section 6301 provides that the General Assembly finds that public safety and health and the environment are threatened by unsound hazardous waste management practices, and proclaims that the purpose of the Act is to create a hazardous waste regulatory structure capable of protecting the public and the environment from unsound management practices. We further find evidence of the General Assembly's intent in the broad manner in which the Act defines the term "person," 7 *Del.C.* § 6302(10), and in the vast array of enforcement tools with which DNREC is provided. 7 *Del. C.* § 6309. *See Northeastern Pharmaceutical,* 810 F.2d at 745 ("imposing liability upon only the corporation, but not those corporate officers and employees *who actually make corporate decisions,* would be inconsistent with [the Legislature's] intent to impose liability upon the persons who are involved in the handling and disposal of hazardous substances"). (Emphasis supplied.) We hold that corporate officers may be held personally liable in appropriate circumstances for actually making corporate decisions resulting in the improper disposition of hazardous waste under the Act. 7 *Del. C.* § 6308(4). Timothy P. Bjur and J. Jeffrey Reinholtz, *3A Fletcher Cyclopedia Corporations* § 1135 (1990) (citations omitted) (hereinafter *"Fletcher"*):

> [C]orporate officers, charged in law with affirmative official responsibility in the management and control of the corporate business, cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval.

*See also* 2 Restatement of Agency 2d §§ 343–44, and *Vuitch v. Furr,* D.C.App., 482 A.2d 811, 821 (1984) (act or omission by corporate officer logically leads to inference he participated in act).

▮ It is not enough that the officer knew of an improper disposal. Simple knowledge is not sufficient for the imposition of personal liability. Rather, the officer must be shown to have been "actively involved in the alleged violative activity." *Conservation Chemical Co. of Illinois,* 733 F.Supp. at 1221. The State must show that the officer directed, ordered, ratified, approved, or consented to the improper disposal. *See Fletcher* at § 1135. *See also Northeastern Pharmaceutical,* 810 F.2d at 740–745 (manager responsible for waste disposal found liable where he acted to dispose of waste).[11]

11. In *Northeastern Pharmaceutical,* the court    adopted the "ultimate authority" test. Under

## B. Personal Liability of Spano

 Applying the above standards to the present case, we find that Spano is not personally liable for improperly disposing of the hazardous waste at the Raintree site. Spano was a corporate officer who had broad, general authority for the Raintree project and direct knowledge of the disposal trenches, but he did not direct, control, approve, consent to, or ratify the decision to dispose of the construction waste. We find the Board's determination that Spano was not a responsible party is supported by substantial evidence and is consistent with applicable law.

## CONCLUSION

We find that the Superior Court correctly held that DNREC's cross-appeal was timely filed. We further hold that the Superior Court did not err as a matter of law in holding that the construction waste constituted hazardous waste within the meaning of the Act. Finally, the Superior Court correctly held that corporate officers may be personally liable in appropriate circumstances for improperly disposing of hazardous waste, but that Spano is not liable under the facts of this case. The order of the Superior Court affirming the Environmental Appeals Board is **AFFIRMED**.

that test a corporate officer may be held personally liable for the improper disposal of hazardous waste which causes an imminent and substantial danger to human health or the environment if he or she has corporate authority and responsibility for those corporate operations which include the disposal of hazardous waste

substances. 810 F.2d at 745. It is not necessary in this case to decide whether the General Assembly intended that a finding of personal liability may be imposed where the *only* basis for the imposition of liability would be the adoption of the *ultimate authority test.*