**DRR, L.L.C., a Delaware Limited
Liability Corporation,
Plaintiff,**

v.

**SEARS, ROEBUCK AND CO., a New
York corporation, Defendant.**

Civil Action No. 94–401 MMS.

United States District Court,
D. Delaware.

Argued Nov. 12, 1996.

Decided Dec. 17, 1996.

Christopher J. Battaglia, of Biggs & Battaglia, Wilmington, DE, for plaintiff.

Donald M. Ransom and Stacey L. Cummings, of Casarino, Christman & Shalk, Wilmington, DE; Of Counsel: Stuart J. Lieberman and Robert J. Cash, of Goldshore & Wolf, Plainsboro, NJ, for defendant.

## *OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

### I. INTRODUCTION

Plaintiff DRR, L.L.C., ("DRR"), a Delaware corporation, has filed suit against defendant Sears, Roebuck & Co. ("Sears"), a New York corporation, for claims arising out of its purchase of certain real property in Wilmington, Delaware. Docket Item ("D.I.") 1 at ¶ 2 of Complaint. Pursuant to a 1992 purchase and sale agreement, Ralph and Rosalind Paul ("the Pauls" or "Paul") bought property from Sears. *Id.* at ¶ 3. The Pauls later assigned their interest to DRR. *Id.* at

¶ 4. Following settlement, DRR began to redevelop the property. *Id.* at ¶ 9. In doing so, it discovered five 2,000 gallon underground storage tanks containing oil and oil compound. *Id.* at ¶ 10.

As a result of this environmental hazard, DRR ceased its redevelopment efforts and removed the tanks at an alleged expense of over $63,000.00. *Id.* at ¶ 18. DRR originally filed an action in the Delaware State Superior Court alleging Sears was responsible for the expenses incurred in DRR's clean-up of the tanks and the concomitant delay in redevelopment. *Id.* Count I of the complaint alleges a cause of action against Sears for fraud, and Count II is an action in strict liability against Sears for violating the Delaware Hazardous Substance Cleanup Act ("DHSCA"), DEL.CODE ANN. tit. 7, § 9101 *et seq.* (1991).

Sears answered, removed to this Court, and filed a counterclaim against DRR. In Count I of the counterclaim, Sears alleges, under the terms of the sales contract, DRR must indemnify, defend and hold harmless Sears from all costs arising from this lawsuit. D.I. 6 at 6, ¶ 6. In Count II, Sears alleges a breach of contract claim against DRR, because Sears made a demand that DRR indemnify, defend, and hold harmless Sears and DRR refused that demand. *Id.* at ¶ 8. In Count III, Sears alleges DRR violated its duty of good faith and fair dealing with Sears. *Id.* at 7, ¶ 13. For Counts I and II, Sears seeks attorney fees and a declaratory relief that DRR must abide by the sales contract and indemnify, defend, and hold harmless Sears from all claims and cost relating to this litigation. *Id.* at 6, ¶ 6(a), (b); *id.* at 7(a), ¶ 9(a), (b). Sears asks for the same relief for Count III, but also asks for compensatory and punitive damages. *Id.* at 8, ¶ 13(d).

Sears filed a motion for summary judgment on both of DRR's counts, and DRR responded with a motion for partial summary judgment limited to its fraud claim. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332. For the reasons below, Sears' motion will be granted.

## II. FACTUAL BACKGROUND

This dispute centers around the sale of Sears' Wilmington, Delaware store. The store was an old one; it had opened in 1950 and undergone significant reconstruction, including the addition of a new automotive service center in 1965. D.I. 76 at Exh. 1. Sears was looking to relocate to a more choice location in the Wilmington area. The Pauls were looking to prevent urban decay from engulfing their commercial investments in the immediate area. D.I. 25 at ¶ 4. To those ends, Sears entered into discussions with the Pauls regarding the sale of the store, including the automotive center. D.I. 73 at 16. By any account, Mr. Paul is an astute businessman, well-versed in commercial real estate dealings. D.I. 73 at 59.

Discussions yielded, on April 1, 1992, a proposed purchase and sales contract. The terms of the proposed contract are quite clear, and the result of negotiation through counsel. Paul was given a 120–day option to purchase the store for three million dollars. D.I. 73 at 32–34. In paragraph seven of the contract, the parties agreed that Sears "has not made any representations with respect to the condition of the Premises, and Purchaser [Paul] will otherwise accept it in an 'as is' condition." D.I. 73 at 18. Further, the contract provided Paul with a 120–day period prior to settlement in which he could pursue due diligence tests and various other environmental studies of the store. D.I. 73 at 21–23. Finally, the other contractual provision relevant to this case is paragraph thirteen. Paragraph thirteen provides, in pertinent part:

13. *Environmental Indemnification and Hold Harmless.*

(a) ... **[B]ecause Purchaser acknowledges that it will have ample opportunity to investigate the Premises, Purchaser agrees to indemnify, defend and hold harmless Seller ... from any claims,** costs (including reasonable attorneys fees and court and arbitration costs), expenses, **direct or indirect,** causes of action, penalties, liabilities, losses and damages actually sustained and incurred by Seller ... **arising from, alleged to arise from, or caused by, in whole or in part, the condi-**

tion of the Premises and specifically including any state or federal environmental claims arising because of hazardous material, ... or which arise from Purchaser's failure to perform obligations under this agreement.

(b) Purchaser shall be responsible for all reasonable attorney's fees incurred by Seller in connection with the environmental condition and/or environmental liabilities associated with the Premises. Counsel for Seller shall be selected by Seller and not Purchaser.

(c) This indemnity shall survive the closing.

D.I. 73 at 21 (emphasis added).

Counsel for Paul who negotiated the contract freely admitted that Paul was well aware of the legal significance of the "no representations" and "as is" clauses contained in paragraph seven. And although the Pauls were principally concerned about an asbestos problem (candidly acknowledged by Sears), Paul was also cognizant of the broad scope of the indemnification provision. Counsel for Paul interpreted the provision for his client: "Sears is saying they are not going to pay any of the costs to clean up any kind of problem you might encounter." D.I. 73 at 61–62.[1] Therefore, counsel for Paul appropriately recommended a Phase I environmental investigation.

Paul decided to forego the investigation, however; he simply let the sales contract lapse by failing to close within the 120 day period. D.I. 73 at 32. Two months later, however, the parties resuscitated the first contract by reducing the sales price from three million dollars to one million dollars and setting a new closing date. D.I. 73 at 32–34. Paul agreed to take the property on the same terms and without further investigation; he was also aware the indemnification clause fully applied to the final sale. Prior to closing, the Pauls validly assigned their rights to purchase the property to plaintiff DRR, a limited liability company created for the express purpose of redeveloping the former Sears store.

In a letter before closing, Sears sent a letter to the Pauls that read: "Sears hereby confirms to you its intention to remove at Sears [sic] sole and exclusive expense, the oil storage tank located at the Sears Auto Center...." D.I. 73 at 36. There were also four gas tanks in the general vicinity of the one oil storage tank. Sears was fairly certain the gas tanks had been removed but promised Paul that if they were still there, it would remove them at Sears' expense. D.I. 76 at Exhibit ("Exh.") 4. Sears eventually removed one oil tank sometime after closing, no gas tanks were found, and in Paul's opinion, "everything worked out well[.]" D.I. 73 at 37. Unfortunately, the relationship between the parties did not remain copacetic for very much longer.

Apparently, at the time of the renovation in 1965, a total of six 2,000 gallon underground storage tanks of waste oil were abandoned. Sears had removed one tank it knew about, but that left a total of five oil tanks, oozing with hazardous materials, still hidden in the earth. They would not stay hidden for long. In December of 1993, while excavating a portion of the parking lot, a DRR construction manager discovered oil-stained soil. D.I. 24 at 2, ¶ 9. Construction ceased immediately. By December 9th of 1993, DRR had discovered and removed five tanks and the 3,500 gallons of oil and water that remained in them. D.I. 76 at Exh. 6. Both parties agree a Phase I environmental investigation would have disclosed the existence of the tanks. D.I. 75 at 13.

This discovery triggered a flurry of fruitless correspondence. DRR's contracting counsel wrote:

I recognize that the Contract of Sale clearly cast the environmental responsibility on Ralph Paul, and I agree that he accepted that contractual provision, and is in the

---

1. As William F. Lynch, II, counsel for the Pauls, testified:

I said to him that I was concerned from day one about the fact that Sears was hard lining us on the environmental issue and they were saying that **if there were environmental prob**-lems that came up from whatever source, be it governmental or as I have said, be it governmental, or mortgagee or tenant or whatever, **that was going to be his problem, and not Sears.**
D.I. 73 at 63 (emphasis added).

process of discharging that responsibility as to the asbestos problem in the building itself. However, Sears' pre-contract representations to him that there was one buried tank, and that Sears would remove it at no cost to him, led him to believe that Sears was accepting the responsibility for all underground tanks.

D.I. 73 at 40. Sears did not budge. The next step was another flurry of papers; this lawsuit, these motions.

Certain pertinent details regarding the parties' precontractual actions came to light. First, it appears Sears was not aware the five tanks at issue were still present at the time of closing. An internal Sears memorandum—entitled "Proposal to Sell"—contained a report on the property by Environmental Engineer Berradine Palka. D.I. 73 at 116–21. The report disclosed that one of the "environmental concerns" of the property was: "The original auto center was attached to the retail store. There had been a total of six 2000 gallon underground storage tanks for motor oil and used oil. **These tanks are believed to have been removed but there is no documentation regarding when and by whom.**" D.I. 73 at 121 (emphasis added). Ms. Palka's report was based partly on a set of 1951 construction prints which depict five squares roughly in the location of the underground tanks. D.I. 78 at Exh. 3, 121–22. Paul was not given that set of prints; they were found only in Chicago, Illinois. D.I. 83 at 3, ¶ 10. Instead, Paul was given every set of prints in the Wilmington store. D.I. 83 at 5, ¶ 7. While none of the plans found in Wilmington show the five squares depicted in the Illinois plans, Paul never asked for all the plans, or if the Wilmington plans represented all of the plans for the store. D.I. 83 at 5, ¶ 6.

Ms. Palka's mistaken belief pervaded the minds of Sears personnel. Before the real estate closing, the Sears store manager requested a personal favor from former Chief Engineer, Chester Roberts. The manager asked if Mr. Roberts would take an afternoon break from his retirement and show Paul's

employees "how to operate the store boiler and related kinds of operational matters." D.I. 73 at 105, ¶ 4. Roberts was only too happy to oblige; unwittingly becoming a key figure in the Sears–DRR imbroglio.

In response to a question from a Paul employee, Mr. Roberts stated that it was his understanding that any tanks associated with the previous automotive center were removed when the new automotive center opened in the 1960's. D.I. 73 at 106, ¶ 5. Since Mr. Roberts did not start his employ with Sears until 1972, he based this information strictly on what others had told him over the years he had worked in the store. *Id.* Mr. Roberts had seen pipes in the store basement—what served as the basement for the old auto service center. D.I. 78 at Exh. 1, 27. These pipes led to the hidden underground tanks; while the pipes would be a "red flag" to an environmental engineer, they meant little to Mr. Roberts, whose credentials as "Chief Engineer" consisted of a stint as a police officer.[2] He took what he had been told—that the tanks had been removed before 1972—at face value. In fact, when Mr. Roberts heard that tanks were discovered, he was "so surprised . . . [he] went to the Sears store to see the tanks myself." *Id.* at ¶ 6. The reaction of the Store Manager at Sears succinctly captures the mind set of all those involved; when informed of the five undisclosed tanks, he stated "it was absolutely unbelievable." D.I. 73 at 113.

## III. LEGAL ANALYSIS

### A. Summary Judgment Standard

Both parties have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Rule 56 requires the Court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).

---

**2.** Mr. Roberts testified he was "[r]esponsible for the maintenance and the upkeep of the entire building, property—you know, the cleaning of

the building, hiring the porters . . ., supplying material that we needed, buying parts and things." D.I. 73 at 84.

"[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

Where there is a dispute, the non-moving party must place in the record sufficient evidence for the Court to find a genuine issue of material fact.

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case; and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The parties are in basic agreement to the facts outlined above. Generally, their dispute is over the legal implications of those facts.

### B. Count I—Fraud

#### 1. The Requisite Mens Rea

■ The parties have contractually fixed the law governing this case as that of Delaware. D.I. 73 at 25, ¶ 26. Plaintiff is correct in its assertion that an "as is" clause in a sales contract will not insulate a seller from suit for its fraudulent misrepresentations. *See Lock v. Schreppler*, 426 A.2d 856, 860 (Del.Super.Ct.1981).

■ In Delaware, the elements of fraud are quite plain. There must be: (1) a false representation of material fact; (2) the knowledge or belief that the representation was false, or made with reckless indifference to the truth; (3) the intent to induce another party to act or refrain from acting; (4) justifiable reliance on the representation in the form of action or inaction; and (5) damage ensuing to the other party as a result. *Matter of Enstar Corp.*, 593 A.2d 543, 549 (Del. Ch.1991). Additionally, there are three types of fraud: (1) false statements represented as truth; (2) active concealment of facts which prevents the other party from

discovering them; and (3) silence in the face of a duty to speak. *Id.* (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069 (Del.Super.Ct.1983); *Lock*, 426 A.2d at 861).

Significantly, all three types of fraud require a certain level of scienter on the part of the defendant; a misrepresentation must be made either knowingly, intentionally, or with reckless indifference to the truth. *Wolf v. Magness Constr. Co.*, 1994 WL 728831, *5 (Del.Ch. Dec. 20, 1994); *Matter of Enstar Corp.*, 593 A.2d at 549. Plaintiff asserts a lesser scienter requirement is needed; that is, even representations made negligently or innocently may be consider fraudulent. D.I. 75 at 15. Plaintiff has overlooked, however, the significant difference between an action in equitable fraud and a claim of common law fraud.

■ Whether unintentional fraud is actionable depends on the relief sought. *Clark v. Teeven Holding Co., Inc.*, 625 A.2d 869, 877 (Del.Ch.1992). The reasoning of the Delaware Chancery Court in *Wolf v. Magness Construction Co.*, 1994 WL 728831, is instructive on this point. In *Wolf*, buyers were dissatisfied with the new house they had purchased from the builders. *Id.* at *1. The buyers, when inspecting the house before closing, expressed concern about a drainage easement. *Id.* at *4. The sales agent for the builder assured the buyers the drainage would be a "gentle swale" similar to the one behind a model house. *Id.* The drainage behind the buyers' house had not been constructed yet; the agent's statement led the buyers to believe the sales contract guaranteed a "gentle swale" similar to the drainage behind the model house. *Id.* In fact, the contract gave the builder complete discretion over the size and character of the drainage. *Id.*

When the buyers moved into their new home, they discovered not a "gentle swale" behind their house, but a deep, unsightly ditch. *Id.* Horrified, they filed a fraud and misrepresentation action; they were promised a "gentle swale," and they wanted one. *Id.* Significantly, the sales agent testified at a deposition he never would have promised a "gentle swale" to the buyers had he known

(1) the builder had such complete discretion, and (2) the result of that complete discretion could be a deep ditch. *Id.*

The *Wolf* court first noted the buyers could have elected to reject the contract by bringing an equitable action for rescission. *Id.* at 5 (citing *Clark*, 625 A.2d at 877). Instead, they chose to accept the contract and seek a further remedy in tort; thus, they stated a claim for common law fraud, not equitable fraud. *Id.* (citing *Clark*, 625 A.2d at 877). This distinction was vital, the *Wolf* court reasoned, because while an equitable action for rescission requires a lesser scienter requirement, "[t]o state a claim for common law fraud, plaintiffs must show that defendant acted with knowledge that the representation was false, or with **reckless indifference** to its falsity." *Id.* (emphasis added) (citing *Stephenson*, 462 A.2d at 1074). The sales agent simply misunderstood the underlying sales contract, the court held; he intended to supply the buyers with accurate information about the drainage. *Id.* While the builder may have inadequately trained their sales agents, there was no evidence the builder recklessly disregarded the possibility its agents would misrepresent provisions of the contract. *Id.*[3]

As in *Wolf*, the plaintiff here is not seeking to rescind the sales contract. Indeed, DRR has redeveloped the old Sears property, complete with major structural changes. Rather, as in *Wolf*, this is an action in common law fraud. And, as in *Wolf*, this distinction is vital.

**3.** In *Wolf*, the court held the plaintiffs failed to establish a claim for common law fraud. *Wolf*, 1994 WL 728831, at *5. The court did not grant summary judgment, however; it noted Count IV of the complaint requested relief for fraud *and misrepresentation.* It further noted Count IV might state a claim for negligent representation; since "Delaware recognizes claims for negligent misrepresentation based on a theory of negligence, which is distinct from fraud," the court ordered further briefing on a possible claim for negligent misrepresentation. *Id.* The court ultimately held for the plaintiffs as a matter of law on the negligent misrepresentation claim. *Wolf v. Magness Constr. Co.*, 1995 WL 571896, *2 (Del. Ch. Ct. Sept. 11, 1995).

But here, DRR made no claim of misrepresentation in its complaint; Count I of its complaint mentions *only fraud.* It has briefed the count as

Thus, with all three types of fraud, DRR must show Sears or its agents acted with knowledge that its representations were false, or with reckless indifference to its falsity. *Stephenson*, 462 A.2d at 1074. Reckless indifference requires a "conscious indifference to the decision's foreseeable results." *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 529 (Del.Super.Ct.1987). Mindful of this necessary element, the Court examines each of the three types of fraud alleged by DRR.

## 2. False Statements Represented as Truth

As an example of a misleading statement, DRR submits the letter from Sears promising to remove one oil tank at its own expense. D.I. 73 at 36. In the letter, Sears wrote to confirm "its intention to remove, at Sears [sic] sole and exclusive expense, the oil storage tank located at the Sears Auto Center...." *Id.* DRR argues its predecessors in interest, the Pauls, "believed and understood this particular representation to be an affirmative representation meaning that there was a total of one underground oil storage tank(s) on the Property, and further, that Sears was thereby agreeing to remove it at its expense." D.I. 75 at 16.[4]

DRR also highlights the statements of Mr. Roberts, the former Chief Engineer at the Sears store. According to DRR, Mr. Roberts told employees of Paul that any underground oil tanks were removed. DRR also faults Mr. Roberts for not disclosing the existence of pipes which, it turns out, led to

a fraud claim with both a reckless indifference and negligence scienter requirement, however. DRR has not cited the Restatement section for negligent misrepresentation, nor has it expressly argued the claim in its brief. Finally, at argument, counsel expressly defined his claim as one for fraud.

**4.** There is a substantial question as to whether this letter can even be considered as a representation. The sales contract—which does not mention any promise to remove any oil tanks—quite clearly states "Sears has not made any representations with respect to the conditions of the Premises." D.I. 73 at 18. Further, counsel for the Pauls conceded the parties "did not reduce this [the promise] to the form of a representation. This was just the dealings that the parties had with each other." D.I. 73 at 69.

the underground oil tanks. Thus, DRR argues, Paul justifiably relied on the letter from Sears and the statements by Mr. Roberts. Because Sears affirmatively disclosed, with an implication of exclusivity, the existence of one oil tank, and further promised to remove it, Paul opted not to engage in an environmental investigation of the property. Since both parties agree a rudimentary environmental investigation would have revealed the oil tanks, DRR argues Sears should be responsible for the cost DRR incurred in cleaning up the tanks.

In *Hill v. Cabot,* 1994 WL 878954 (Mass.Super. Oct. 27, 1994), a Massachusetts court was confronted with a very similar situation. In *Hill,* Hill bought property from Cabot; both parties acknowledged it contained hazardous waste. *Id.* Prior to closing, Cabot disclosed the existence of some hazardous material, and Hill received eighteen reports concerning potential environmental contamination of the property. In a purchase agreement strikingly similar to the one at issue here, Hill agreed the building was bought "as is" and Cabot made no representation as to the condition of the buildings. *Id.* at *3. As with the agreement here, Hill clearly assumed the risk of further hazardous waste clean-up costs. *Id.* at *5.

Hill asserted Cabot fraudulently represented the nature of the property by failing to disclose hazardous waste located beneath a tank; according to Hill, this misrepresentation vitiated any written agreements between the parties. *Id.* While the court recognized that fraud does eviscerate an "as is" agreement,[5] it also found there was no evidence to establish that Cabot knew there was hazardous waste underneath the tank; at most, Hill could demonstrate a Cabot employee knew of the possibility of hazardous waste. *Id.* at *6.

Further, the *Hill* court noted, Cabot "made no affirmative representations as to the amount of hazardous waste on the property...." *Id.* at *7. And since the agreement that Hill would be liable for future environmental problems was between "sophisticated businessmen active in real estate transactions," *id.* (citing *Greenery Rehab.*

*Group v. Antaramian,* 36 Mass.App.Ct. 73, 628 N.E.2d 1291, 1294 (1994)), even if Hill could show Cabot knew of the possibility of contamination beneath the tank, Hill could not recover "absent an affirmative representation that every particle of hazardous waste had been uncovered." *Id.* at *7.

■ *Hill* has two important lessons for this case. First, there is no evidence that Mr. Roberts, who allegedly stated there were no other tanks, or the Store Manager, the supervisor who authorized Mr. Roberts to conduct the tour, knew or was reckless to the possibility of additional tanks. In fact, their consistent and uniform reaction to the discovery of the five tanks has been astonishment. Mr. Roberts was so surprised he felt the need to see them himself. And the Store Manager felt the prospect of additional tanks was "absolutely unbelievable." When Mr. Roberts stated there were no other tanks, he was firmly convinced he was speaking the truth.

Second, the letter from Sears made no "affirmative representation," Hill, *id.* at *7, that the tank it was removing was the only tank on the property, or that it would remove any other tanks later found on the property. It merely states Sears would remove one tank at its own expense. Indeed, there is no evidence Sears knew, or consciously disregarded a risk, of other tanks. As Ms. Palka wrote in the sale proposal, the tanks were "believed to have been removed," but there was no documentation. D.I. 73 at 117. This is not surprising, considering the renovation in which everybody thought the tanks were removed took place in the early to mid 1960's.

■ But even if Sears did recklessly disregard a risk that there were hazardous tanks remaining underground, the "as is" sales contract clearly left DRR to bear the risk of any "unknown" claims. *See HM Holdings, Inc. v. Rankin,* 70 F.3d 933, 936 (7th Cir.1995) (enforcing "as is" contract); *Niecko v. Emro Mktg. Co.,* 973 F.2d 1296, 1302 (6th Cir.1992) (same); *Hill,* 1994 WL 878954, *7. Importantly, the agreement that Paul would be

---

**5.** Although the *Hill* court interpreted Massachusetts law, Delaware law also holds an "as is" clause does not shield a party from liability for fraud. *See Lock,* 426 A.2d at 861–62.

responsible for any future environmental problems was negotiated between two knowledgeable, sophisticated entities. Paul was well aware of the provision, and the fact that it was broad and could cover more than just asbestos problems. D.I. 73 at 56. It even tried—albeit unsuccessfully—to get Sears to narrow the scope of the provision. *Id.* Finally, Paul was contractually allotted 120 days to investigate the property; despite the advice of his counsel, he decided not to investigate.

There are hidden costs in not enforcing an "as is" and "no representations" clause in a case like this. In *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411 (1st Cir.1985), then-Judge Breyer outlined some of these concerns. In *V.S.H. Realty*, a buyer of land brought, among other things, a Massachusetts unfair business practices claim against the seller because the seller did not disclose oil leaks of which it "should have known." *Id.* at 418. The First Circuit Court of Appeals reversed the district court's dismissal of the unfair business practices claim; Judge Breyer dissented. Allowing the claim to proceed, wrote Judge Breyer, "virtually reads the 'as is'" language out of the contract, and out of the law. *Id.* at 420 (Breyer, J., dissenting). By reading the "as is" language out of the contract, he reasoned, a seller will have to check every aspect of its property and list every defect it can find; otherwise it will almost certainly be liable. *Id.* at 421. Yet, as Judge Breyer pointed out, "it is the very purpose of an "as is" contract to shift the burden of inspection and the costs of hidden defects to the buyer." *Id.*

Judge Breyer warned of the commercial costs in allowing such an action to proceed— it "may harm those whom the [unfair business practices statute] seeks to protect." He elaborated:

> To insist that the knowledgeable business seller disclose all material facts that the seller should have known (to forbid, in effect, the "as is" contract), is to prevent the buyer and seller from allocating costs and risks as they choose in both the presumably rare situation involving deceptive conduct by the seller and the more typical nondeceptive situation. And, such a prohi-

bition, as a general matter, may raise the price of the underlying good or service by preventing the allocation of risks (e.g., of hidden defects) to the party willing to bear them most cheaply. Of course, one may think of this general price-increasing tendency as too theoretical, as ephemeral, or not worth much consideration when consumer protection is on the other side of the balance scale; but, it is, at the least, worth consideration when weighed against the need to protect those who typically need no protection (such as knowledgeable business buyers).

*Id.* Similarly, DRR needs no protection here. Paul cannot show anyone at Sears knowingly or recklessly made false representations there were no other tanks. He had ample opportunity to conduct an environmental investigation on the property. Indeed, he neglected counsel's admonitions to perform such an investigation. Rather, Paul, an astute real estate investor, is seeking to bypass the "as is" provision found in paragraph seven of the contract. To elide paragraph seven would provide Paul protection where none is warranted.

### 3. Concealment of Facts

■ DRR asserts Sears failed to provide Paul with all the construction plans. Specifically, it alleges Paul was given store plans that did not indicate there were underground tanks, while plans that did intimate the presence of tanks were withheld. It is undisputed, however, that the plans indicating there were underground tanks were in Chicago; Paul was given all the plans in the Wilmington office. While this was certainly unfortunate, and perhaps even a blunder by Sears, there is no evidence to support a theory the plans were withheld from Paul in an attempt to dupe him.

### 4. Silence in the Face of a Duty to Speak

■ In general, a seller of property is under no duty to speak for the benefit of another. *Hendrick v. Lynn*, 37 Del.Ch. 402, 144 A.2d 147 (1958). Plaintiff stresses that in Delaware, whenever a vendor makes a statement about a matter concerning proper-

ty, that vendor is under a legal duty to make a full, fair and complete disclosure about that matter. *Lock,* 426 A.2d at 862. Accurate but incomplete assertions may be fraudulent in the absence of qualifying material. *Id.* This results in an anomaly—a vendor may be better off remaining tight-lipped and cold-hearted than disclosing some helpful, if incomplete, information to assuage a guilty conscience. *Compare Hendrick,* 144 A.2d 147 (granting summary judgment for silent seller in action for fraud arising from sale of termite infested home) *with Lock,* 426 A.2d 856 (denying summary judgment on fraud count because seller informed purchaser of termite treatment, but not structural damage caused by termites).

Nevertheless, this is classic, black-letter Delaware law; DRR urges it applies in this case. Once Sears "opened the door on the issue of underground tanks," DRR alleges "it was under a legal duty to tell the Pauls everything it knew about them." D.I. 75 at 31. According to DRR, the "everything" includes the Proposal to Sell and the original construction prints. If privy to those materials, DRR assures this Court, the Pauls would never have bypassed a thorough environmental investigation during the 120–day period allotted for just such a purpose.

DRR principally relies on *Lock v. Schreppler,* 426 A.2d 856, to bolster its position. In *Lock,* a realtor agreed to represent a family in the sale of its house. 426 A.2d at 857. The family told the realtor the house had been infested with termites, which caused structural damage to the house. *Id.* As evidence, the family showed the realtor the visible slope in the living room floor. *Id.* When the realtor found willing buyers for the house, he told them the house had been treated for termites. There was conflicting evidence on whether the realtor told the buyers of the structural damage, but "even if some mention was made of damage, the import of the conversation was such as to convey to the plaintiffs the impression that any damage due to the termite infestation was minor." *Id.* at 861. The house was sold "as is." *Id.* at 858.

After finding the house uninhabitable because of structural damage, the buyers sued the realtor for fraud. *Id.* at 859. The court first recognized "[a] representation may be fraudulent even if it is true, if the defendant knows that because of facts not stated, the statement is materially misleading." *Id.* at 862 (citing RESTATEMENT (SECOND) OF TORTS § 529). The court denied the realtor's motion for summary judgment because of the realtor's allegedly misleading statements as to the extent of damage to the house. *Id.*

 There is a significant difference between *Lock* and this case. In *Lock,* the realtor *knew* of the structural damage to the house, and *knew* it was something more than minor. *Id.* at 857. Yet, through his statements to the buyers, he intentionally conveyed the message that any damage was insignificant. *Id.* at 861–62. Sears, on the other hand, did not know there were other underground tanks, and it did not imply to the Pauls there was only one tank with the intent of concealing the others. As rehearsed above, Sears' personnel were uniformly uninformed about the five underground tanks. While such ignorance by Sears may have been sloppy or negligent, a higher level of scienter is needed for common law fraud. *Wolf,* 1994 WL 728831, at *5.

Of course, DRR counters that Ms. Palka's report in the Proposal of Sale shows Sears knew of the *possibility* of other tanks. DRR also points out that Sears informed Paul about the possible existence of four gas tanks, and offered to take them out at its own expense if they were discovered while Sears was removing the single oil tank. D.I. 76 at Exh. 4. This statement, while literally true, argues DRR, created a false impression—that Sears was candidly revealing to DRR all environmental problems with the store. It follows, according to DRR, that Sears was under a duty to disclose the possibility of the five oil tanks. DRR's putative dart splinters in mid-air, however, falling short of its target. First, Sears (and the Pauls) balanced uncertainties through contractual agreement; specifically, paragraph seven, which contains the "as is" clause, and paragraph thirteen, which granted the Pauls a 120–day period in which to perform its own environmental investigation. For reasons

expressed earlier in this opinion, such an allocation of risks is permissible.

■ But most importantly, DRR has failed to show Sears had the requisite level of scienter to be held liable for common law fraud. While it is true, as DRR ably argues, that "a statement literally true is actionable if made to create a false impression," *Remeikis v. Boss & Phelps, Inc.*, 419 A.2d 986, 989 (D.C.1980), there is no evidence that Sears made any statement recklessly or with the intention of creating a false impression. Were this a claim of negligent misrepresentation, summary judgment may be inappropriate. But in a fraud case—the case presented here—an intent to mislead is indispensable. There is no evidence that Sears was armed with such intent.

## C. Count II—Strict Liability

Although DRR has failed to introduce a triable issue of fact regarding fraud, it has a second cause of action—strict liability—which potentially renders the lack of scienter by Sears irrelevant. DRR has alleged Sears is liable for the costs of remediating the tanks pursuant to DHSCA, DEL.CODE ANN. tit. 7, § 9101 *et seq.* DRR specifically alleges Sears was an "owner or operator" while oil, a hazardous substance, was released into the environment. DEL.CODE ANN. tit. 7, § 9105. Thus, under Count II, Sears' actions during negotiations are immaterial, so long as it is comes under the terms of the statute. Sears acknowledges all this, but defends by pointing to the sales contract; under paragraph thirteen, any environmental liability was assumed by DRR.

There is no precedent on whether a party can contractually assume environmental liability under the DHSCA. The Delaware Supreme Court has, however, likened DHSCA to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a). *T.V. Spano Bldg. Corp. v. Department of Nat'l Resources & Envtl. Control*, 628 A.2d 53, 59

n. 7 (Del.1993). And under CERCLA, private parties can contractually allocate potential CERCLA liability among themselves. *SmithKline Beecham Corp. v. Rohm and Haas Co.*, 89 F.3d 154, 158 (3d Cir.1996); *Keywell Corp. v. Weinstein*, 33 F.3d 159 (2d Cir.1994); 42 U.S.C. § 9607(e)(1).

Unlike DHSCA, CERCLA specifically authorizes indemnification agreements. *See* 42 U.S.C. § 9607(e)(1). Further, while the primary purpose of CERCLA is remediation of environmental pollution, DHSCA is aimed at prevention and preservation. *T.V. Spano Bldg.*, 628 A.2d at 59 n. 7. DRR presses none of these points here, however. Rather, it reiterates its argument that fraud should vitiate the indemnification agreement. As explained earlier, this argument fails. In the alternative, DRR cautions this Court from acting without certification on the issue to the Delaware Supreme Court.

■ Taking its cue from the comparisons of the Delaware Supreme Court, this Court sees no reason private parties should not be able to contractually allocate their liability under DHSCA, as they can with CERCLA. DRR is alleging a violation of a state environmental statute, a violation covered in the broad indemnification provision.[6] Its claim falls directly within the indemnification provision. Thus, its claim is barred.

## D. Sears' Application for Attorney's Fees

Sears argues the indemnification clause renders DRR liable for attorney's fees expended in this action. Sears stresses the broad language of paragraph thirteen of the contract—DRR is responsible for "all reasonable attorney's fees incurred by [Sears] in connection with the environmental condition and/or environmental liabilities associated with the Premises." D.I. 73 at 21[7]. Because of this language, Sears argues, the indemnification clause applies to claims between Sears and DRR as well as claims brought against Sears by third parties.

---

6. The indemnification provision makes DRR responsible for "any state or federal environmental claims arising because of hazardous material...." D.I. 73 at 21.

7. For the full text of the provision, see *supra* pp. 1134–1135 of opinion.

 

DRR responds by noting Delaware law disfavors contractual clauses purporting to exonerate a party from liability in matters resulting from its own negligence.[8] *Paoli v. Dave Hall, Inc.*, 462 A.2d 1094, 1098 (Del.Super.Ct.1983); *J.A. Jones Constr. Co. v. City of Dover*, 372 A.2d 540 (Del.Super.Ct.1977). Further, Delaware law requires indemnification clauses to be clear and unequivocal—"if a contrary intent can reasonably entertained, the Court will rule against indemnification." *Paoli*, 462 A.2d at 1098 (citing *Blum v. Kauffman*, 297 A.2d 48 (Del.Super.Ct.1972)).

DRR argues the indemnification clause does not clearly extend to actions by DRR against Sears. In *Cannon & Son, Inc., v. Dorr–Oliver, Inc.*, 394 A.2d 1160 (Del.1978), the Delaware Supreme Court pondered an indemnification clause in an agreement between a contractor and a subcontractor. As here, the indemnitee sought to recover from the indemnitor attorney's fees incurred as a result of defending and counterclaiming in a suit with the indemnitor. *Id.* at 1165. The *Cannon* court noted the indemnity clause "is a kind commonly found in construction contracts and is intended to protect the general contractor (and owner) from suits brought by third parties who are injured by acts of the subcontractor." *Id.* at 1165.

 This Court is persuaded the indemnification agreement was only intended to recompense Sears for attorney's fees in actions brought by third parties. The indemnity clause is a kind commonly found in real estate sales contracts. Further, the attorney's fees clause states "[c]ounsel for [Sears] shall be selected by [Sears] and not [DRR]." D.I. 73 at 21. This strongly indicates the indemnification provision did not contemplate actions between Sears and DRR. Unless Sears anticipated the adversarial system of civil litigation would be jettisoned in the near future, there would be no reason to state explicitly it would retain the right to have its own representation in an action brought by DRR. Given the disfavor for indemnity clauses in Delaware law, and given the plausible reading of the clause to apply only to actions brought by third parties, this Court holds Sears is not entitled to an award of attorney's fees. *But see Hill v. Cabot*, 1994 WL 878954, *8 (Mass.Super. Oct. 27, 1994) (holding indemnification clause allows award of attorney's fees for prevailing party in action between indemnitor and indemnitee).

---

8. True enough, but this case involves a claim of fraud, not negligence.