SUSSEX COUNTY DEPARTMENT OF ELECTIONS, Kenneth L. McDowell, Elaine Manlove, and Delaware Department of Elections, Defendants Below, Appellants,

and

The Democratic Party of the State of Delaware, Intervenor Below, Appellant,

v.

SUSSEX COUNTY REPUBLICAN COMMITTEE, the Republican State Committee of Delaware and Brian Pettyjohn, Plaintiffs Below, Appellee.

No. 581, 2012.

Supreme Court of Delaware.

Submitted: Oct. 30, 2012.
Decided: Jan. 16, 2013.

Ian R. McConnel, State Solicitor; Ann Woolfolk and Ilona Kirshon, Department of Justice, Wilmington, Delaware, for appellants.

Lisa B. Goodman, James M. Yoch, and Paul L. Loughman, Young Conaway Stargatt & Taylor, Wilmington, Delaware;

Elizabeth Daniello Maron, Maron Marvel Bradley & Anderson, P.A., Wilmington, Delaware, for Intervenor appellant.

William E. Manning and Richard A. Forsten, Saul Ewing LLP, Wilmington, Delaware, for appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en banc.

STEELE, Chief Justice:

In this appeal, we consider whether the Chancellor correctly interpreted 15 *Del. C.* § 3306, which allows political parties to replace candidates who become incapacitated. We hold that, under the statute, the term *incapacity* includes situations where a candidate would be practically incapable of fulfilling the duties of the office in a minimally adequate way. In determining whether the standard was met, the Chancellor could consider events that occurred after the candidate withdrew. We conclude that the withdrawing candidate was incapacitated and therefore **AFFIRM** the judgment of the Court of Chancery.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On September 11, 2012, Eric Bodenweiser won the Republican Party's primary for Delaware's 19th State Senatorial District and became the party's general election candidate. Soon after his victory, Bodenweiser became the target of a Delaware State Police investigation into alleged sexual abuse of a minor. As the investigation progressed, Bodenweiser made fewer public appearances and eventually suspended his campaign on October 12. After he ceased campaigning, Bodenweiser stopped communicating with the Republican Party. On October 17, Bodenweiser unilaterally withdrew from the race. The Department of Elections then began printing absentee ballots without a Republican candidate for the 19th State Senatorial District.

Plaintiff–Appellee the Sussex County Republican Committee sought to replace Bodenweiser on the ballot with Plaintiff–Appellee Brian Pettyjohn through a supplemental certificate of nomination, a procedure that allows a political party to replace incapacitated candidates.[1] The Department of Elections responded to the supplemental certificate on October 18 and inquired into what "physical, mental, or other incapacity" prevented Bodenweiser from serving. Bodenweiser did not respond to his party's attempts to obtain an affidavit to facilitate the investigation.

On October 22, a grand jury indicted Bodenweiser on 113 felony counts relating to sexual abuse of a minor. Bodenweiser turned himself in to authorities and was released on bail the next day, subject to the conditions that he be monitored via a global positioning system bracelet[2] and abstain from any contact with persons under 18 years old. On October 24, the Department of Elections issued a final rejection of the Republicans' supplemental certificate and indicated that it would conduct the election for the 19th State Senatorial District without a Republican candidate.

The Sussex County Republican Committee, Republican State Committee of Delaware, and Pettyjohn (collectively "the Republicans") filed suit in the Court of Chancery against the Commissioner of

---

1. 15 *Del. C.* § 3306.

2. It is unclear from the record whether the bracelet limited Bodenweiser's freedom of movement.

Elections, the Delaware Department of Elections, the Sussex County Department of Elections, and its Director [3] (collectively "the Commissioner"). The Republicans sought an injunction directing the Commissioner to add Pettyjohn to the ballot and moved for a temporary restraining order to prevent the Commissioner from printing ballots without a Republican candidate. After a hearing, the Chancellor granted the Republicans' requested relief, holding that Bodenweiser was incapacitated for the purposes of 15 *Del. C.* § 3306. The Chancellor held that the combination of Bodenweiser's bail conditions, safety and security concerns, and Bodenweiser's need to attend to his defense rendered him incapable of serving in the General Assembly. The Commissioner has appealed, arguing that the Chancellor committed two errors in his analysis. First, she argues that Section 3306 allows a party to submit a replacement candidate only in the case of actual, rather than practical, incapacity. Second, incapacity must be determined at the moment of withdrawal, and the Chancellor improperly considered events (such as the indictment and the imposition of bail terms) that occurred after Bodenweiser withdrew.

## II. STANDARD OF REVIEW

■ The Chancellor's interpretation of a statute is a question of law, which we review *de novo*.[4]

## III. DISCUSSION

### A. The meaning of *incapacity* as used in 15 *Del. C.* § 3306.

#### 1. Section 3306

In Delaware, "major political parties" must hold a direct primary election to choose their general election candidate.[5] The winner of a major political party's primary becomes that party's nominee for the general election.[6] After a candidate is nominated, his party may replace him only in a few circumstances. Once the deadline for filing certificates of nomination has passed,[7] the party may only replace the candidate via a supplemental certificate of nomination. The procedure for filing a supplemental certification of nomination is described in 15 *Del. C.* § 3306, which provides, in relevant part:

(a) Whenever it shall be determined, subsequent to [the filing deadlines established in 15 *Del. C.* § 3303], that a duly nominated candidate will be unable to serve if elected because of death, physical, mental or other incapacity, the state, county ... committee shall convene within 24 hours of said determination to authorize the filing of a supplemental certificate of nomination for a substitute candidate.... However, in the case of the death of a candidate, said committee may convene within a reasonable period of time sufficient to have the new candidate's name placed on the bal-

---

**3.** The Chancellor allowed the Democratic Party of the State of Delaware to intervene in this action. *See* Ct. Ch. R. 24.

**4.** *Freeman v. X–Ray Assocs., P.A.,* 3 A.3d 224, 227 (Del.2010) (citing *Dambro v. Meyer,* 974 A.2d 121, 129 (Del.2009)).

**5.** 15 *Del. C.* § 3101A. The statute defines "major political party" as "any political party which, as of December 31 of the year immedi-

ately preceding any general election year, has registered in the name of that party voters equal to at least 5 percent of the total number of voters registered in the State." 15 *Del. C.* § 101(15)(a).

**6.** 15 *Del. C.* § 3107.

**7.** 15 *Del. C.* § 3303.

lot, but in no case later than 5 days from the date of death.[8]

The parties agree that Bodenweiser was the duly nominated Republican candidate for the 19th State Senatorial District and that he was neither physically nor mentally incapacitated. They dispute whether Bodenweiser's situation amounted to "other incapacity" as used in Section 3306.[9] That frames the issue before us.

### 2. General principles of statutory interpretation

■ The meaning of *incapacity* as it is used in Section 3306 is a question of statutory construction. When construing a statute, we attempt to ascertain and give effect to the General Assembly's intent.[10] First, we must determine whether the relevant statute is ambiguous.[11] A statute is ambiguous when it can reasonably be interpreted in two or more different ways "or if a literal reading of its terms 'would lead to an unreasonable or absurd result not contemplated by the legislature.'"[12] If we determine that a statute is unambiguous, we give the statutory language its plain meaning.[13] If we determine that a

statute is ambiguous, "we consider the statute as a whole, rather than in parts, and we read each section in light of all others to produce a harmonious whole."[14] We presume that the General Assembly purposefully chose particular language and therefore construe statutes to avoid surplusage if reasonably possible.[15]

### 3. The meaning of "other incapacity"

■ Section 3306 allows political parties to replace a candidate if a "duly nominated candidate will be unable to serve if elected because of death, physical, mental or other incapacity."[16] *Black's Law Dictionary* defines *incapacity* as a "lack of physical or mental capabilities."[17] The General Assembly explicitly used the word *other* in addition to the words *physical* and *mental*, however. Construing the statute against surplusage[18] requires us to hold that a lack of certain nonphysical, nonmental capabilities can render a candidate incapable of serving if elected.

The crux of this dispute is the breadth of the term *incapacity*. The Commissioner argues for what she describes as a "true and actual" incapacity standard.[19] This

---

8. 15 *Del. C.* § 3306.

9. The Commissioner acknowledged that the Department of Elections could replace Bodenweiser's name with Pettyjohn's before Election Day. This is not a case where replacing a candidate's name would make it infeasible to hold the election on the scheduled date.

10. *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del.1985).

11. *Doroshow, Pasquale, Krawitz & Bhaya v. Nanticoke Mem. Hosp., Inc.*, 36 A.3d 336, 342 (Del.2012).

12. *CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del.2011) (quoting *LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 933 (Del.2007)).

13. *Doroshow*, 36 A.3d at 343 (citing *Eliason v. Englehart*, 733 A.2d 944, 946 (Del.1999)).

14. *Id.* (quoting *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 538 (Del.2011)).

15. *CML V*, 28 A.3d at 1041 (citing *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 538 (Del.2011)).

16. 15 *Del. C.* § 3306.

17. *Black's Law Dictionary* 828 (9th ed. 2009).

18. *CML V*, 28 A.3d at 1041; *see also Freeman v. X-Ray Assocs., P.A.*, 3 A.3d 224, 229 (Del. 2010) (noting that courts should interpret statutes to give "each distinctive term an independent meaning").

19. Opening Br. 4.

narrow definition would limit incapacity to situations such as death or being in a comatose state, where there is no conceivable set of circumstances in which the candidate could fulfill any official duty.[20] The Republicans argue that we should affirm the Chancellor's broader "practical" incapacity standard, which considers whether the candidate is unable as a practical matter to serve his constituents.[21] Both interpretations are reasonable constructions of the word *incapacity*, and therefore the statutory language is ambiguous.

 Applying her "true and actual" standard, the Commissioner argues that "other incapacity" is essentially limited to situations where the candidate is ineligible for the office sought.[22] Under the Commissioner's reading, a person younger than 27 who seeks to serve in the Delaware Senate[23] or a convicted perjurer[24] would meet the standard for "other incapacity." Because we have previously interpreted the Delaware Constitution's prohibition against legislators who have been convicted of "infamous crimes"[25] to apply only after a court has found the person guilty and imposed a sentence,[26] the Commission-

er submits that only this standard can suffice to establish "other incapacity." While ineligibility for office would certainly render a candidate "unable to serve if elected,"[27] the General Assembly used the term *other incapacity*, not *ineligibility*. The word *other* mandates a fact-specific inquiry into the candidate's capacity that cannot be limited to a discrete category such as legal ineligibility.

### 4. Section 3306 encompasses practical incapacity.

The General Assembly has announced the purposes underlying our election laws. Our election statutes are intended to "assure the people's right to free and equal elections" and to establish a system "[f]or the orderly and fair selection of party nominees . . . and for the filling of vacancies among such nominees."[28]

When construing a statute, it is often helpful to examine the statute's history.[29] Section 3306's current language dates to the 1976 amendments to Delaware's election statute.[30] Before the amendments, Section 3306 provided that "[i]n case of death, resignation or removal of any candi-

---

**20.** *Id.*

**21.** Answering Br. 5. *See Smith v. N.Y.C. Transit Auth.*, 18 A.D.2d 10, 238 N.Y.S.2d 250, 251 (1963) (defining "incapacity" as a "practical inability").

**22.** Opening Br. 5.

**23.** Del. Const. art. II, § 3 ("No person shall be a Senator who shall not have attained the age of twenty-seven years . . . .").

**24.** Del. Const. art. II, § 21 ("No person who shall be convicted of embezzlement of the public money, bribery, perjury or other infamous crime, shall be eligible to a seat in either House of the General Assembly. . . .").

**25.** *Id.*

**26.** *See Fonville v. McLaughlin*, 270 A.2d 529, 530 (Del.1970) (construing the Delaware Con-

stitution's prohibition on officeholders who have been convicted of infamous crimes narrowly because it creates a disability of citizenship).

**27.** 15 *Del. C.* § 3306.

**28.** 15 *Del. C.* § 101A (explaining the purpose of Delaware's election laws); *Bartley v. Davis*, 1986 WL 8810, at *10 (Del.Ch. Aug. 14, 1986) (interpreting election statute to further the purposes expressed in 15 *Del. C.* § 101A) *aff'd,* 519 A.2d 662 (Del.1986).

**29.** *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 495 (Del.2000) (citing 2A Norman F. Singer, *Sutherland Statutory Constr.* § 48.03 (5th ed. 1992)).

**30.** 60 Del. Laws ch. 412, § 2 (1976).

date subsequent to nomination ... a supplemental certificate may be filed by the proper officers...."[31] The legislative history surrounding Section 3306's amendment indicates that the General Assembly was concerned that existing law had made it too easy to add, remove, or replace candidates on the ballot.[32] The ease with which candidates could be replaced on or removed from the ballot created the potential for arbitrary or tactical withdrawals which in turn burdened the Department of Elections.

The amendment to Section 3306 made it more difficult for political parties to replace candidates. After the amendment, a candidate's mere resignation or removal does not entitle his party to automatically substitute another candidate's name on the ballot. A candidate's subjective desire to withdraw from the campaign, which might be motivated by poor poll performance or the appearance of a more electable individual, is insufficient reason to replace the candidate.

The statute is equally clear, however, that in proper circumstances political parties may replace candidates after the filing deadlines have passed. Recognizing that unforeseeable exigencies might deprive voters of a true choice between candidates, the statute allows supplemental certificates of nomination to be filed in certain situations. If the candidate dies, or is physically, mentally, or otherwise incapacitated, he may be replaced.

Though the Commissioner cites no authority for her definition of *incapacity*, her argument appears to rely on the doctrine of *noscitur a sociis*, which provides that words grouped in a list should be given related meaning.[33] Because the statute provides that "death, physical, mental or other incapacity"[34] may render a candidate unable to serve if elected, only situations akin to the absolute incapacity created by death, or as constitutional ineligibility, would qualify.

Although statutory construction canons are "aids in the quest to ascertain the legislative intent," the application of a single standard may not resolve uncertainty.[35] Another statutory construction canon— that the statute he construed as a whole[36] —weighs against the Commissioner's interpretation. The statutory structure separates death from incapacity. Unlike the words *physical*, *mental*, and *other*, the word *death* does not modify *incapacity*, but is an independent term. Though the statute requires party committees to file a supplemental certificate within 24 hours of determining that a candidate is unable to serve, it permits the party up to five days to file in the case of death.[37] The General Assembly's decision to make the maximum filing period five times longer in the case of death rather than incapacity strongly

**31.** 15 *Del. C.* § 3306 (1949).

**32.** *Debate on S.B. 328*, 128th Gen. Assem., at 1:00–6:03 (Jun. 19, 1975) (statement of Betty Ponds, Director, New Castle County Department of Elections) (voicing the Department of Elections' concern that the statute allowed candidates to be replaced "practically the day before the election").

**33.** *Del. Bd. of Nursing v. Gillespie*, 41 A.3d 423, 427 (Del.2012) (citing *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990)).

**34.** 15 *Del. C.* § 3306.

**35.** *Keeler v. Harford Mut. Ins. Co.*, 672 A.2d 1012, 1015 (Del.1996).

**36.** *CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del.2011) (citing *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 538 (Del.2011)).

**37.** 15 *Del. C.* § 3306.

indicates that it considered death to be more serious than incapacity. It would not make sense to provide for such a different procedure in the case of death if incapacity were limited to analogous circumstances. Finally, unlike incapacity, death is necessarily permanent and does not occur in differing degrees. The fundamental differences between the two terms weigh against interpreting them identically.

Section 3306 only requires a level of incapacity that renders the candidate unable to serve his constituents if elected. A legislator's ability to serve encompasses far more than merely being able to vote "aye" or "nay" on legislation; it includes the full scope of a legislator's duties.[38] At the hearing, the Chancellor asked the parties whether a serious heart attack would create a physical incapacity under Section 3306 if a physician advised a candidate that serving as an elected official would put his health in danger.[39] The hypothetical candidate could cast the occasional vote at Legislative Hall with accommodation, but he would be too feeble to attend committee hearings, respond to petitions from constituents, or otherwise strain himself.[40] No party attempted to dispute that this scenario could create an inability to serve for the purposes of Section 3306–though the candidate could not meet the Commissioner's "true and actual" incapacity standard.[41]

The Chancellor's hypothetical is apt. In some circumstances, a candidate could theoretically perform a few official duties with significant accommodation, but could not practically serve his constituents in a minimally adequate way. The Commissioner's interpretation precludes any consideration of a candidate's practical ability to serve his constituents so long as it is possible to conceive of a way that he could perform any official duty, however inadequately. The General Assembly's intent to limit a political party's ability to replace candidates does not compel the conclusion that the General Assembly sought to bar the replacement of practically incapacitated individuals when there is no colorable argument that the replacement was pretextual. The Commissioner's interpretation is not mandated by the statute's language, and may frustrate the election statute's stated purpose to provide for "free and equal"[42] elections by depriving voters of a choice between opposing candidates who are practically able to serve their constituents.

■ We view a person as incapacitated for the purposes of 15 *Del. C.* § 3306 if that person is practically incapable of fulfilling the duties of the office in a minimally adequate way. Only a very serious physical, mental, or other incapacity will meet this standard. Interpreting *incapacity* to include situations where the candidate is practically unable to fulfill his official duties if elected is consistent with the drafters' intent to limit a candidate's ability to withdraw, but without creating a nearly insurmountable standard that denies voters a true choice. This interpretation prevents candidates from withdrawing

---

38. *See, e.g.,* Karl T. Kurtz et al., *Full–Time, Part–Time, and Real Time: Explaining State Legislators' Perceptions of Time on the Job,* 6 St. Pol. & Pol'y Q. 322, 324–25 (2006) (noting that a legislator's duties are not limited to legislative sessions, but include constituent casework, speechmaking, and many other functions).

39. *Sussex Cnty. Republican Comm. v. Sussex Cnty. Dep't of Elections,* C.A. No. 7982, at 63, 65 (Del. Ch. Oct. 26, 2012) (TRANSCRIPT).

40. *Id.* at 38–39.

41. *Id.* at 39, 62.

42. 15 *Del. C.* § 101 A.

because of poor polling, the appearance of a more formidable candidate, or other inconvenient circumstances, yet provides the voters a choice between candidates who are practically capable of serving them.

### 5. Bodenweiser was practically incapacitated.

 Applying this standard to Bodenweiser, it follow that he suffers from a nonphysical, nonmental condition that renders him practically incapable of fulfilling the duties of a State Senator in a minimally adequate way. Bodenweiser is under indictment for 113 felony counts relating to the sexual abuse of a minor. He is subject to monitoring via a global positioning system bracelet and is forbidden to have contact with anyone under the age of 18.

Bodenweiser's bail conditions would make it impossible for him to meet with his constituents, give speeches, or visit large portions of his district. It is hard to conceive of how Bodenweiser could make public appearances without violating his bail conditions. Attending sessions at Legislative Hall would probably involve contact with minors.[43] Even if it were possible for him to perform his duties without contacting minors, the inflammatory nature of the accusations against him would create a substantial security risk to Bodenweiser and to those around him. Sexual abuse allegations are emotionally charged, especially when the victim is a child. The risk of violence is not insignificant. As the Commissioner conceded, the General Assembly would need additional security if Bodenweiser were elected.[44]

Bodenweiser's need to attend to his defense also provides support for a finding of incapacity. He has been charged with 113 felony counts relating to sexual abuse of a minor, and he faces many years in prison if ultimately convicted. Under these circumstances, he will understandably spend a considerable amount of his time preparing a defense. State Senators and other public officials are subject to constant public scrutiny, so Bodenweiser could hardly ignore inquires from the press and the public regarding the allegations. Under these circumstances, Bodenweiser would need to avoid the public sphere to lessen the risk of saying something that could be damaging to his case.

Under these circumstances, Bodenweiser's situation is no less incapacitating than that of a person who suffers from a serious physical or mental health condition. We cannot conceive how Bodenweiser could practically fulfill the duties of his office in a minimally adequate way when he is barred from contacting many of his constituents, cannot visit large portions of his district, creates a significant security risk to himself and others, must spend a large portion of his time preparing a defense to 113 serious felony charges, and cannot make public comments without potentially undermining his defense.

The argument that this interpretation will lead to pretextual, tactical withdrawals cannot withstand scrutiny. Very few pending criminal charges will establish incapacity under Section 3306. We are confident that even the most devoted partisans would not place themselves in Bo-

---

**43.** At trial, counsel for the Democratic Party argued that the Delaware Constitution might protect Bodenweiser from arrest during his travel to and from, and attendance during, legislative sessions. Del. Const. art. II, § 13. Without addressing the merits of this inter-

pretation, Bodenweiser's need to rely on a constitutional provision to even attend a legislative session hardly weighs in favor of a finding that he is capable of serving.

**44.** *Sussex Cnty.,* C.A. No. 7982, at 43.

denweiser's position for the sake of their parties' success at the polls.

The Commissioner's final argument is that even the most serious indictments cannot incapacitate an individual. She supports that position by pointing to a rogues' gallery of disgraced federal and state politicians who remained in office despite indictments. These examples are not persuasive. This argument conflates an officeholder's refusal to resign from a position with his ability to serve. An indicted person's continued hold on an office does not mean that the person is practically capable of serving his constituents. While it is possible to capably serve despite criminal allegations, the Commissioner's examples do not involve comparably serious and numerous allegations or bail conditions that are present in this case. We do not regard the "other incapacity" to exclude Bodenweiser's situation.

**B. The Chancellor properly considered all the facts that were available to the Commissioner when she rejected the Republicans' supplemental certificate of nomination.**

██ Having determined that Bodenweiser was otherwise incapacitated for the purposes of Section 3306, we turn to the Commissioner's alternative contention that the Chancellor erroneously considered facts that came into existence only after Bodenweiser submitted a withdrawal form posted on the Department of Elections' website.[45] The Commissioner argues that

Section 3306's plain meaning requires that incapacity be determined at the moment of withdrawal (October 17, 2012). Here, the indictment was not issued until October 22, and the bail conditions were not set until the day thereafter.

Section 3306 allows for the filing of a supplemental certificate of nomination "[w]henever it shall be determined ... that a duly nominated candidate will be unable to serve if elected."[46] No statutory language limits the analysis of a candidate's incapacity to the facts as they existed at the moment of withdrawal. The Commissioner did not provide any statutory provision establishing a procedure for a "duly nominated" candidate's withdrawal.[47]

Section 3306 does not contemplate or attach significance to the Department of Elections' nonstatutory withdrawal form. As previously discussed, the General Assembly deleted the words *resignation* and *removal* from Section 3306 when it amended the statute. The statutory intent for a candidate's objective incapacity determination to be the focus of Section 3306 (rather than the candidate's personal desire to remove himself from the race) weighs against giving dispositive significance to the date of a candidate's withdrawal. By attaching statutory consequences to a procedure not contemplated by the statute, we would be judicially amending Section 3306.

The Commissioner argues this interpretation violates the statutory construction canon that prohibits interpretations that yield an "unreasonable or absurd result."[48]

---

45. Opening Br. 8.

46. 15 *Del. C.* § 3306.

47. The statute contemplates a candidate's withdrawal in other circumstances, such as a primary election, but does not describe a procedure for the withdrawal of a duly nominated candidate in the general election. *See* 15 *Del. C.* § 3101 (allowing a candidate in the primary election to withdraw his "notification of candidacy" until "the first Friday after the second Tuesday in July" or the next business day if that day is a holiday).

48. *CML V, LLC v. Bax*, 28 A.3d 1037, 1042 (Del.2011) (citing *LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 933 (Del.2007)).

She notes that a candidate could withdraw from a race for personal reasons. At this point, the candidate could not be replaced on the ballot. If the candidate later died or became incapacitated, however, Section 3306 would allow a replacement.

This perceived absurdity vanishes once it is acknowledged that a candidate's withdrawal has no statutory significance. Under Section 3306, it does not matter whether a duly nominated candidate is actively campaigning, has stopped campaigning, or has withdrawn from the race. Section 3306 applies to a "duly nominated candidate," a status Bodenweiser acquired when he won the Republican Party's primary. Bodenweiser's withdrawal from the race did not undo his primary election victory or somehow take away his nomination. The statute's plain meaning allows a party to replace a candidate only where the candidate has died or become incapacitated, regardless of whether the candidate is still actively seeking office. If a duly nominated candidate ceases campaigning for a reason that is not contemplated by the statute, Section 3306's purpose to eliminate pretextual withdrawals is served by not permitting a replacement. If the candidate later dies or becomes incapacitated, however, the statute allows substitution, which gives the public a meaningful choice between candidates.

The Commissioner's interpretation would incentivize delay, which in turn would increase the burden on the Department of Elections to make the necessary adjustments to absentee ballots and voting machines. That construction is unreasonable and is not compelled by the statute. Bodenweiser's decision to withdraw before the grand jury issued the indictment gave his party, opponents, and the Department of Elections additional notice that he might be incapable of serving if elected.

In this case, the Republican Party acted as promptly as possible based on the limited information available to it. At the time the Commissioner rejected the Republican Party's supplemental certificate of nomination on October 24, all of the facts the Chancellor relied upon were available to the Department of Elections. During the period between the Republicans' filing of the certificate and the Commissioner's rejection, the grand jury issued the indictment, Bodenweiser turned himself in to the authorities, and bail conditions were imposed. We are not confronted with a case in which the facts supporting an incapacity determination were wholly unknown to the Commissioner, or where the events supporting an incapacity determination occurred after the Commissioner had rejected the supplemental certificate of nomination.[49]

The procedures for filing a supplemental certificate of nomination are less than clear, and the statute would benefit from legislative revision. Here, we conclude that the Chancellor properly reviewed all the facts that were available to the Commissioner at the time she rejected the Republicans' supplemental certificate.

## IV. CONCLUSION

For these reasons, the Court of Chancery's judgment is **AFFIRMED**.

---

49. The Commissioner's rejection of a supplemental certificate of nomination under those circumstances would raise the additional questions of whether the Commissioner must wait a reasonable period of time before rejecting a certificate, revisit her earlier rejection, or require the filer to submit a new certificate.