# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| REHOBOTH BAY HOMEOWNERS' ASSOCIATION, | § § § | No. 139, 2020 |
| Appellant-Below, Appellant, | § § § § | Court Below: Superior Court of the State of Delaware |
| v. | § § | C.A. No. S18A-03-003 |
| HOMETOWN REHOBOTH BAY, LLC, | § § § § | |
| Appellee-Below, Appellee. | § § § | |

| | | |
|---|---|---|
| JOHN IACONA and ROBERT WEYMOUTH, | § § § | No. 296, 2020 |
| Appellants-Below, Appellants, | § § § § | Court Below: Superior Court of the State of Delaware |
| v. | § § | C.A. No. S17A-04-001 |
| HOMETOWN REHOBOTH BAY, LLC, | § § § § | |
| Appellee-Below, Appellee. | § § § | |

Submitted: March 3, 2021
Decided: May 7, 2021

Before **SEITZ**, Chief Justice; **VAUGHN** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court.   **AFFIRMED IN PART, REVERSED IN PART** and **REMANDED**.


Olga Beskrone, Esquire, Community Legal Aid Society, Inc., Wilmington, Delaware, for Appellant, Rehoboth Bay HOA, and for Appellants, John Iacona and Robert Weymouth.

Michael P. Morton, Esquire (*Argued*), Robert J. Valihura, Esquire, and David C. Zerbato, Esquire, Morton, Valihura & Zerbato, LLC, Greenville, Delaware, for Appellee, Hometown Rehoboth Bay, LLC.


**VAUGHN**, Justice:

2

This opinion decides two appeals that raise issues involving the application of the Rent Increase Justification Act (the "Act").[1] The Act governs rent increases in manufactured home communities. Both appeals involve the Rehoboth Bay Manufactured Home Community (the "Community"), which is located on Rehoboth Bay in Sussex County. The community owner, or landlord, Hometown Rehoboth Bay, LLC ("Hometown") is the Appellee in both appeals. The Appellant in No. 139, 2020 is Rehoboth Bay Homeowners' Association (the "HOA"), the homeowners' association. The Appellants in No. 296, 2020 are two individual tenants, John Iacona and Robert Weymouth.

No. 296, 2020 involves an effort by Hometown to raise lot rents in an amount in excess of the Consumer Price Index for this area (the "CPI-U"), for the calendar year 2017. No. 139, 2020 involves an effort by Hometown to raise lot rents in an amount in excess of the CPI-U for the calendar year 2018. The leases involved all have 12-month terms that correspond to the calendar year.

Under the Act, proposed rent increases that exceed the CPI-U must be justified by certain factors. One of those factors is that the community owner "can demonstrate the increase is justified" by the "cost of any capital improvements or rehabilitation work[,] . . . as distinguished from ordinary repair, replacement, and

---

[1] 25 *Del. C.* §7050 *et. Seq.*

3

maintenance." [2]     Separate arbitrators in both cases found that a Bulkhead Stabilization project performed by Hometown in phases over more than one year was a capital improvement or rehabilitation work (hereinafter sometimes referred to simply as "capital improvement"), which, along with other capital improvements and other expenses, justified rent increases in excess of the CPI-U in both years. Under each arbitrator's decision, Hometown recovers the proportionate share of the cost of the capital improvements in full for each lot involved in these appeals in one year, 2017 and 2018, respectively.   Both decisions, however, as construed by all the parties, allow Hometown to incorporate the capital improvement component of the rent increases for those two years into each lot's base rent for the next lease period and all successive lease periods thereafter.

The increases in lot rent for some of the capital improvements are undisputed. The Appellants claim, however, that the Superior Court erred by affirming the arbitrators' decisions that the Bulkhead Stabilization project was a "capital improvement or rehabilitation work" and not "ordinary repair, replacement, and maintenance."   They also claim that the Superior Court should have ruled that the Act does not permit Hometown to incorporate the capital improvement component of the rent increases into each lot's base rent so as to carry those increases forward into ensuing years.   Affirming the arbitrators' decisions with that result, they claim,

---

[2] 25 *Del. C.* § 7052(c)(1).

4

is error.   The Appellants contend that allowing Hometown to carry the rent increases for capital improvements forward into future years, after recovering a lot's full proportionate share of the costs in the first year, violates the Act because it results in Hometown recovering the cost of the improvements many times over.

For the reasons that follow, we conclude that the Superior Court's rulings that the Bulkhead Stabilization project is a capital improvement or rehabilitation work are correct and should be affirmed.   We have also concluded, however, that the Act does not permit Hometown to incorporate the capital improvement component of the 2017 and 2018 rent increases into a lot's base rent for succeeding years after recovering that lot's full, proportionate share of those costs in those years.   The Act permits a rent increase which fully compensates a community owner for the cost of capital improvements.   Where a one-year rent increase does so, however, the cost of those improvements does not justify a multi-year rent increase which results in the community owner receiving multiple recoveries of the same cost.

Therefore, the Superior Court's judgment will be affirmed in part, reversed in part, and the cases remanded for further proceedings.

## FACTS AND PROCEDURAL HISTORY

The Community includes five-hundred-twenty-five rentable lots.   It has significant water frontage on Rehoboth Bay.   That frontage is protected by a bulkhead.   According to Tara Edmonds, Hometown's regional manager, the

5

bulkhead was reviewed by engineers and consultants who determined that "the entire wall was not stabilized and that none of the existing wall would be able to survive past another storm."[3] In 2015, Hometown hired a contractor to perform Bulkhead Stabilization, which was to be completed in three phases.[4] Contracts between Hometown and the contractor reflect that the Bulkhead Stabilization consisted of (1) installing rock or "riprap" in front of the existing bulkhead, and (2) stabilizing the failing section of the bulkhead by installing new pilings in front of it, new Deadman pilings behind it, and then connecting the two with a galvanized steel tie rod.

In September 2016, Hometown sent written notice of a lot rent increase to the lot tenants informing them that rent for the 2017 calendar year was going to increase by over $102.94 per month. The notice explained that these costs were attributed to an increase in the CPI-U, capital improvements or rehabilitation work, and changes in property or other taxes, insurance costs and financing, and reasonable operating and maintenance expenses. Out of the total rent increase, $90.46 was attributed to capital improvements or rehabilitation work.

Section 7052 of the Act imposes three conditions a community owner must satisfy in order to increase lot rent above the CPI-U.[5] It is undisputed that

---

[3] App. to Appellee Hometown's (No. 139, 2020) Ans. Br. at B0090.

[4] According to Ms. Edmonds, Hometown did not seek a rent increase from the lot tenants for the cost of the first phase.

[5] Section 7052 was formerly 7042. The numbering changed due to amendments and renumbering of sections.

Hometown satisfied the first two conditions and they need not be discussed further. The third condition consists of a list of eight factors which can serve to justify such an increase. Of these eight factors, only the first, § 7052(c)(1), is relevant to these cases. That subsection provides that a rent increase above the CPI-U may be justified by "[t]he completion and cost of any capital improvements or rehabilitation work in the manufactured home community, as distinguished from ordinary repair, replacement, and maintenance."[6] Section 7053 requires the community owner to send written notice of the increase to the affected lot tenants, to the homeowners' association (if there is one), and to the Delaware Manufactured Home Relocation Authority (the "Authority") not less than 90 days before the increase is to take effect. It also requires a "final meeting" between the community owner and the affected tenants "to discuss the reasons for the proposed increase."[7] After the final meeting, any affected tenant who has not accepted the proposed increase, or the homeowners' association on behalf of any tenant who has not accepted the rent increase, may, within 30 days of the final meeting, petition the Authority for the appointment of an arbitrator to conduct nonbinding arbitration proceedings.[8] The community owner,

---

[6] 25 *Del. C.* § 7052(c)(1). § 7052(c)(6) is similar to § 7052(c)(1). It provides that a rent increase may be justified by "[t]he need for repairs caused by circumstances other than ordinary wear and tear in the manufactured home community." The Appellants ask us to read these two provisions together. We have been mindful of the similarities between the two subsections in analyzing the meaning of § 7052(c)(1). Since the issue before us, as framed by the parties, is limited to the meaning of § 7052(c)(1), we do not separately construe § 7052(c)(6).

[7] 25 *Del. C.* § 7053(b).

[8] Under the version of the act in effect at the time, the community owner could also request

any affected lot tenant, or the homeowners' association may appeal the decision of the arbitrator to the Superior Court. Under § 7054, the Superior Court shall determine "whether the record created in the arbitration is sufficient justification for the arbitrator's decisions and whether those decisions are free from legal error."[9] Finally, §7053(l) allows the community owner to implement the rent increase as originally notified to the affected lot tenants but requires that any rent increase not approved through the above-described process must be rebated.

In the final meeting, the homeowners in attendance were given a PowerPoint presentation that explained the Act and why the 2017 rent was being increased. The presentation included a list of ten capital improvements which totaled $569,900.86. The Bulkhead Stabilization accounted for $459,165.85 of the $569,900.86.

John Iacona and Robert Weymouth, both tenants in the Community, opposed the rent increase and petitioned for arbitration (the "First Arbitration").[10] An arbitration hearing was then held.

Because "capital improvement or rehabilitation work" and "ordinary repair, replacement, and maintenance" are not defined in the Act, the arbitrator turned to

---

arbitration.
[9] 25 *Del. C.* § 7054.
[10] The First Arbitration Order can be found at Appellee Hometown's (No. 296, 2020) Ans. Br. at Ex. B [hereinafter First Arbitration Order at __].

8

Black's Law Dictionary for guidance.[11]  He determined that five of the claimed capital improvements did not qualify as a capital improvement or rehabilitation work.   He found that three qualified in part.   He found that two qualified in full, one being the Bulkhead Stabilization project.   The arbitrator reasoned that "I think it is generally safe to characterize a project of this scale, which focuses on the property itself and preservation, as a capital improvement or rehabilitation work."[12]

He also determined that increases in property taxes and insurance justified an increase in rent, but the operating and maintenance expenses did not.   He calculated that a rent increase of $76.32 per month was justified, plus an increase in the CPI-U of 6%.

Iacona and Weymouth appealed the arbitrator's decision to the Superior Court.   The two issues raised in their appeal to this Court were raised in the Superior Court.[13]   The Superior Court affirmed the decision of the arbitrator that the Bulkhead Stabilization project qualified as a capital improvement or rehabilitation work.   The court, however, did not make any express finding on their argument that the increase attributable to capital improvements should be confined to 2017 because Hometown fully recovered those costs in that one year.

---

[11] 25 *Del C*. § 7003 states that "[u]nless otherwise expressly stated, if a word or term is not defined under this section, it has its ordinarily accepted meaning or means what the context implies." Under the version of the Act in effect at the time, this provision was stated in § 7041.

[12] First Arbitration Order at 9.

[13] *Iacona v. Hometown Rehoboth Bay, LLC*, 2020 WL 4559459, at *1 (Del. Super. Aug. 6, 2020).

9

In September 2017, Hometown sent out another written notice of a lot rent increase to tenants informing them that rent for the 2018 calendar year would increase by $86.12 per month because of new costs incurred. The notice explained that these costs were attributable to capital improvements or rehabilitation work, changes in property or other taxes, and changes in utility charges. $79.99 of the proposed increase was attributable to capital improvements or rehabilitation work.

A final meeting was held where the homeowners in attendance were again given a PowerPoint presentation that explained why the 2018 rent was being increased. The capital improvement portion of the presentation included seven capital improvements totaling $503,954.53. The next phase of the of the Bulkhead Stabilization, phase III, accounted for $441,189.53 of that sum. None of that sum was part of the Bulkhead Stabilization costs included in the 2017 increase. A slide near the end of the presentation stated that "[t]he CPI-U increase and the fixed charges remain in place from January 1, 2018 until the end of tenancy. As of December 31, 2018, this rental amount will be your new base rent on which the January 1, 2019 rent increase will be added."[14] The capital improvements were included among the "fixed charges" referred to, despite the fact that the entire amount of the capital improvements would be recovered in 2018.

---

[14] App. to Appellant HOA's Op. Br. at A055.

The HOA, representing fifteen tenants who did not accept the increase,[15] petitioned for arbitration (the "Second Arbitration").[16]   An arbitration hearing was then held.

The arbitrator in the Second Arbitration was also confronted with deciding what constituted a capital improvement or rehabilitation work as distinguished from ordinary repair, replacement, and maintenance.   The arbitrator developed the following analytical framework for making that decision:

> A cost is a "capital improvement" if it enhances the property value of the community or increases the useful life of the community.   In turn, a cost is not a "capital improvement" if it is for customary, usual, and normal repair, replacement, and maintenance in the community.[17]

Applying this standard, the arbitrator determined that phase III of the Bulkhead Stabilization qualified as a capital improvement or rehabilitation work. The arbitrator reasoned that "the bulkhead project enhanced the community's protective bulkhead with new riprap.   This project protects the community, increases its value, and adds to the useful life of the bulkhead."[18]   The arbitrator also rejected the HOA's argument that the Bulkhead Stabilization was a repair

---

[15] The fifteen tenants represented by the HOA are the remaining homeowners subject to the Second Arbitration proceeding, as all other homeowners in the Community have settled their rent increase with Hometown.

[16] The Second Arbitration Order can be found at Appellee Hometown's (No. 139, 2020) Ans. Br. at Ex. B [hereinafter Second Arbitration Order at __].

[17] *Id.* at 16.

[18] *Id.* 17-18.

because the contractor's invoices listed it as a "repair" and some of community owner's witnesses at arbitration used the term "repair." The arbitrator stated that the project went beyond ordinary work by adding a new and better riprap feature that was not there before. Ms. Edmonds, who the arbitrator found credible, also testified that the riprap was "a better technology."[19]

The arbitrator decided that only four of the seven capital improvements identified by the community owner qualified as capital improvements or rehabilitation work that would justify a rent increase, one being the Bulkhead Stabilization project.

The arbitrator ultimately concluded that a lot rent increase of $74.85 per month was justified. He dismissed the HOA's argument that the capital improvement component of the rent increase should be confined to 2018 because it was recovered in full that year. He did so on the ground that he was bound by the Superior Court case of *December Corp v. Wild Meadows HOA*,[20] which rejected the same argument.

The HOA appealed the Second Arbitration decision to the Superior Court. It raised the issues raised by Mr. Iacona and Mr. Weymouth in their appeal to the Superior Court and which are now raised by both parties in their appeals to this

---

[19] *Id.* at 17.
[20] 2016 WL 3866272 (Del. Super. July 12, 2016).

Court.    The Superior Court affirmed the arbitrator's decision.[21]

## STANDARD OF REVIEW

We review questions of law, including the interpretation of statutes, *de novo*.[22] When interpreting a statute, we attempt to ascertain and give effect to the General Assembly's intent.[23]

> First, we must determine whether the relevant statute is ambiguous.    A statute is ambiguous when it can reasonably be interpreted in two or more different ways "or if a literal reading of its terms 'would lead to an unreasonable or absurd result not contemplated by the legislature.'"    If we determine that a statute is unambiguous, we give the statutory language its plain meaning.    If we determine that a statute is ambiguous, "we consider the statute as a whole, rather than in parts, and we read each section in light of all others to produce a harmonious whole."    We presume that the General Assembly purposefully chose particular language and therefore construe statutes to avoid surplusage if reasonably possible.[24]

As for findings of fact, we have previously concluded that "substantial evidence review is the appropriate standard of review for the arbitrator's factual findings."[25]    Under this standard, we ask "whether there is substantial evidence in

---

[21] *Rehoboth Bay Homeowners' Ass'n v. Hometown Rehoboth Bay, LLC*, 2020 WL 1316831, at *4 (Del. Super. Mar. 16, 2020).
[22] *ACW Corp. v. Maxwell*, 242 A.3d 595, 599 (Del. 2020) (en banc) (quoting *City of Wilm. v. Nationwide Ins. Co.*, 154 A.3d 1124, 1127 (Del. 2017)).
[23] *Sussex Cty. Dep't of Elections v. Sussex Cty. Republican Comm.*, 58 A.3d 418, 422 (Del. 2013) (en banc).
[24] *Id.* (footnotes omitted).
[25] *Sandhill Acres MHC, LC v. Sandhill Acres Home Owners Assoc.*, 210 A.3d 725, 731, n.37 (Del. 2019).

13

the record to support the [arbitrator's] findings and whether such findings are free from legal error."[26]  "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion."[27]

## DISCUSSION

### I

We first consider whether the Bulkhead Stabilization is a capital improvement or rehabilitation work as distinguished from ordinary repair, replacement, and maintenance.  We first look to the Act.  The Act provides that "[u]nless otherwise expressly stated, if a word or term is not defined under this section, it has its ordinarily accepted meaning or means what the context implies."[28]  None of "capital improvement," "rehabilitation work," "ordinary," "repair," "replacement," or "maintenance" are defined in § 7003.  We turn to and apply their ordinarily accepted meanings.

The key word that distinguishes a "capital improvement or rehabilitation work" from "ordinary repair, replacement, and maintenance" is the modifier *ordinary*.  Black's Law Dictionary defines "ordinary" as "[o]ccurring in the regular course of events; normal; usual."[29]  As for "capital expenditure," which is also

[26] *Murphy & Landon, P.A. v. Pernic*, 121 A.3d 1215, 1221 (Del. 2015) (citing *Thompson v. Christiana Care Health Sys.*, 25 A.3d 778, 782 (Del. 2011)).
[27] *Id.* (citing *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 899 (Del. 1994)).
[28] 25 *Del. C.* § 7003.
[29] ORDINARY, Black's Law Dictionary (11th ed. 2019).

termed "capital improvement" in the Black's Law Dictionary, it is defined as "[a]n outlay of funds to acquire or *improve* a fixed asset."[30]   Therefore, it makes sense to characterize an "ordinary repair, replacement, and maintenance" as a regular, normal, and usual repairing of property, while a "capital improvement" is to acquire a long-term, nonrecurring asset or improve or enhance such an asset already in existence.   The Appellants urge us to look to regulations promulgated under the Internal Revenue Code as the exclusive source for determining what is a capital improvement.   We decline to do so.   The Act directs us to look to the ordinarily accepted meaning, which may or may not correspond to a definition contained in an unrelated statute or regulation.

A careful review of the record leads us to conclude that the arbitrators properly categorized the Bulkhead Stabilization as a capital improvement or rehabilitation work.   The Bulkhead Stabilization was a massive project that took place over multiple years at a significant expense.   Testimony was heard from Ms. Edmonds that rip rap, consisting of large rocks, was added onto the bulkhead, which she stated was "a better technology."[31]   The old bulkhead did not have riprap protecting the shoreline.   Several contracts detailing the work to be done on the bulkhead, as well as engineering plans, diagrams, and pictures were all submitted to the arbitrators.

---

[30] CAPITAL EXPENDITURE, Black's Law Dictionary (11th ed. 2019) (emphasis added).
[31] Second Arbitration Order at 17.

Considering all of this, we conclude that there is substantial evidence in the record that supports classifying the Bulkhead Stabilization as a capital improvement or rehabilitation work.

II

We now turn to the Appellants' claim that the Act does not permit Hometown to incorporate the capital improvement component of the 2017 and 2018 rent increases into the base lot rent for subsequent years. The role of the arbitrator under the Act is to render a decision "employing the standards under § 7052[.]"[32] The arbitrator's decision in the First Arbitration does not mention this issue. It approves a rent increase for 2017 without discussing the prospective effect of the increase. As previously mentioned, the arbitrator in the Second Arbitration rejected the HOA's argument on this issue on the ground that he was bound by the Superior Court's opinion in *December Corp. v. Wild Meadows HOA*.[33] We will infer that the arbitrator in the First Arbitration, who issued his decision after *December Corp.*, also intended to be bound by that case. Throughout these proceedings, Hometown has relied upon the Superior Court's reasoning in *December Corp.* as support for its position that the Act allows it to incorporate the capital improvement component of the rent increases into base lot rent for subsequent years.

---

[32] 25 *Del. C.* § 7053(j).
[33] 2016 WL 3866272 (Del. Super. July 12, 2016).

16

In *December Corp.*, the Superior Court considered an appeal from an arbitrator's decision that denied in full a community owner's proposed rent increase that was based on capital improvements. The arbitrator did so on the basis of equitable criteria not mentioned in the Act. The Superior Court reversed the arbitrator's decision on the ground that the arbitrator committed legal error by failing to address the statutory criteria set forth in the Act. The parties raised the issue the Appellants raise here. The Superior Court framed the issue as "whether a community owner is justified in maintaining a rental increase in perpetuity, after one time capital improvement charges are long since recovered."[34] The court ruled that:

> This issue . . . is controlled by the clear language of the statute. . . The Act provides that, if all criteria are met, then an "increase in rent in an amount greater than the CPI-U" is justified. To the contrary, the Act does not provide that a "one time cost recovery rider" is justified. Likewise, the only language in the statute addressing any limitations regarding whether these one time costs can be included as "rent", provides a limitation regarding "future" rental increases. Namely, the statute provides
>
>> [a] community owner also shall not utilize as justification for any future rental increase the cost of capital improvements or rehabilitation work, once that cost has been fully recovered by rental increases that were incorporated into a prior rental increase in excess of CPI-U, where the prior rental

---

[34] *Id.*, at *6.

17

> increase was properly implemented under this subchapter.
>
> Had the General Assembly intended Section [7052](c)(1) or (c)(6) related increases to justify only a one time cost recovery rider then it must be presumed to have so provided. This Court, as an arbitrator making finding facts [sic] and conclusions of law, is bound by the plain language of the statute.[35]

The section of the statute quoted is § 7052(d).

We disagree with the Superior Court's reading of § 7052. In *Bon Ayre Land, LLC v. Bon Ayre Cmty. Ass'n*, which was decided by this Court after *December Corp.*, we recognized that the Act is "effectively a rent control statute."[36] Its stated purpose is to "accommodate the conflicting interests of protecting manufactured homeowners, residents, and tenants from unreasonable and burdensome space rental increases while simultaneously providing for the need of manufactured home community owners to receive a just, reasonable, and fair return on their property."[37] In keeping with the purpose of the Act, we reasoned that "[t]he Act protects homeowners by preserving the initial relationship between themselves and the landowners, which presumably takes into account the landowners' costs and expected profits, unless the landowner's circumstances change in specific ways."[38]

---

[35] *Id.*, at *7 (citing 25 *Del. C.* § 7052) (emphasis added).
[36] *Bon Ayre Land, LLC v. Bon Ayre Cmty. Ass'n*, 149 A.3d 227, 234 (Del. 2016) (en banc).
[37] 25 *Del. C.* § 7050.
[38] *Bon Ayre*, 149 A.3d at 234.

18

We further reasoned that "[t]he homeowner with her home semi-permanently planted in the community is protected from material increases in rent unrelated to the benefits and costs of living in the community, and the landowner receives the return it originally anticipated."[39]

Construing the Act to allow a community owner to recover the cost of a one-time capital improvement year-after-year, even after fully recovering that cost in year one, conflicts with the Act's stated purpose and with our reasoning in *Bon Ayre*. Once the cost of a non-recurring capital improvement is recovered by the community owner in full through a rent increase, the continued assessment of that increase indefinitely becomes unrelated to the benefits and costs of living in the community. Under the Superior Court's interpretation of § 7052 in *December Corp.*, unreasonable and burdensome rent increases are inevitable. The court itself recognized the problems its decision would create by incentivizing owners of manufactured home communities to perform as many costly capital improvements as possible so as to increase their revenue each year to whatever maximum limit the market will bear:

> The Court recognizes that under some circumstances this could create the incentive for a community owner to engage in a constant cycle of never ending capital improvements, which after cost recovery, would provide

---

[39] *Id*. at 235.

for an increased rental stream for each separate capital improvement.[40]

No one disputes that the Act provides that a community owner may raise rent in an amount in excess of the CPI-U where "the community owner can demonstrate the increase is justified" by one or more of the factors set forth in § 7052(c). In our view, however, where the cost of a one-time capital improvement is the justification for a rent increase, the justification for that increase ends when the cost has been fully recovered. A community owner may propose a rent increase that recovers that cost in a one-year lease period, as was done here, or it may propose a rent increase that spreads the recovery of that cost over more than one year or more than one lease period. But the Act's requirement that an increase be justified limits the rent increase for a capital improvement to recovery of the full cost of the improvement justifying the increase.

We do not think that § 7052(d), which the Superior Court appears to have relied upon in part, or any other provision of the Act, calls for the result it reached in *December Corp.* None of the parties to this appeal have mentioned § 7052(d) in their briefs. Since neither party has based a specific argument on that subsection, we will not attempt to ascertain its exact meaning. It does appear to us, however, that the subsection expresses an intent that a community owner may not obtain

---

[40] *December Corp.*, 2016 WL 3866272, at *7.

20

multiple recoveries, year after year, of the cost of the same capital improvement.

The statute requires that a rent increase over the CPI-U be justified by one of the factors set forth in the statute. The justification for an increase based on the cost of non-recurring, capital improvements expires when those costs are fully recovered. Accordingly, we conclude that under the Act, the capital improvement components of the 2017 and 2018 rent increases expired at the end of those years and must be removed from succeeding years' rents.

## CONCLUSION

For the foregoing reasons, the judgment of the Superior Court in both cases is affirmed in part and reversed in part. The cases are remanded to the Superior Court for any further proceedings consistent with this opinion that may be necessary. Jurisdiction is not retained.