# IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE IN AND FOR NEW CASTLE COUNTY

HEATHER HOLVECK and             )
STEVEN MURPHY, JR.,             )
                                )
        Plaintiffs,             )
                                )
    v.                          )        C.A. No: CPU4-20-001503
                                )
CHRISTIANA MEADOWS              )
APARTMENTS,                     )
                                )
        Defendant.              )

Reserved: March 17, 2022
Decided: May 11, 2022

Heather Holveck and Steven Murphy, Jr.      Jillian M. Pratt, Esq.
601 Balsam Ter.,                            3704 Kennett Pike
Wilmington, DE 19804                        Suite 200
*Pro Se Plaintiffs*                         Greenville, DE 19807
                                            *Counsel for Defendant*

## DECISION AFTER TRIAL

**HORTON, J.**

The instant matter is an action based upon a residential lease. On April 25, 2020, Heather Holveck and Steven Murphy, Jr. (collectively as "Tenants") filed a *pro se* Complaint against Christiana Meadows Apartments ("CMA"), in which they allege that CMA wrongfully withheld their security deposit.

A bench trial was held on March 17, 2022, during which Tenants testified during their case-in-chief, and property manager Crystal Rincon ("Rincon") testified for CMA. In addition, both parties submitted documents into evidence.[1] At the conclusion of trial, the Court reserved decision. This is the Court's Final Decision and Order.

## FACTS

The parties' testimony regarding the underlying events was largely consistent, diverging only on the issue of alleged damage to the carpet in Tenants' rental unit. Based on the testimony presented at trial and exhibits admitted into evidence, the Court finds the following relevant facts:

Tenants entered an agreement with CMA to lease a rental unit in CMA's apartment complex (the "Lease") commencing August 10, 2018. Consistent with the terms set forth in the Lease, Tenants tendered a total of $2,750.00 in security deposits.[2]

---

[1]  Pl. Ex. 1 through 4, Def. Ex. 1 through 5.
[2]  Tenants paid a standard deposit of $1,375.00, plus a pet deposit of $1,375.00 for their dog.

2

The Lease terminated in March 2020. Of course, this coincided with self-isolation requirements and unprecedented shutdowns in the wake of the COVID-19 pandemic. Consequently, CMA's office was closed to the public as of March 17, 2020, and it sent a text message to its residents (including Tenants) identifying a phone number and e-mail address for any communications during the shutdown.[3] On March 30, 2020, CMA sent another text message to its residents advising that its office was still closed, but reiterated that they were available by phone and e-mail, and that rent checks could be left in a mail slot in the office door.[4] The following day, March 31, Tenants vacated the unit. Prior to their departure, they cleaned the apartment and took photographs of the carpets, kitchen, and kitchen appliances, and they provided CMA with a forwarding address.

On April 16, 2020, CMA sent Tenants, via USPS mail, a security deposit disposition letter along with two checks (one for each Tenant) totaling $1,690.00 (the "Checks").[5] In the disposition letter, CMA indicated that $1,131.00 was deducted from the security deposit to pay for replacement of carpeting in the unit which, CMA claimed, was necessary due to "very black/stained" carpeting in the walkways.[6]

---

[3]  Pl. Ex. 2.
[4]  Pl. Ex. 2.
[5]  Def. Ex. 2.
[6]  The total expense deduction of $1,131.00 represented the actual cost of replacing the carpet reduced by 20% for depreciation.

On April 23, 2020, seven days after the security deposit disposition letter was mailed, Tenants contacted CMA via written e-mail, objecting to the security deposit deductions (the "Objections"). Tenants asserted that the darkened areas in the walkway amounted to normal wear and tear for a carpet in a common area, and they requested the return of their security deposit in full. Unfortunately, the parties could not reach a resolution on the issue. At some point, Tenants cashed the Checks, and on April 25, 2022, they initiated this litigation seeking double damages for the remainder of their security deposit.

At trial, the parties offered starkly different interpretations of the damage to the carpet. Both Tenants testified that the carpets exhibited normal wear and tear for being an area of high traffic in the apartment, and were not blackened and stained.[7] Holveck admitted that the carpeted walkways were used by Tenants daily to enter and exit the house; by guests who kept on their shoes; and by their dog, whose paws they did not wipe. However, Holveck argued that CMA should have first attempted to shampoo the carpet before replacing it. Holveck also took issue with the fact that the property manager relied on the representations of CMA's maintenance supervisor rather than personally examining the carpet.[8]

---

[7] Pl. Ex. 1, Def. Ex. 3. Murphy testified to having previous work as a construction worker and contractor.

[8] The original property manager who was in communication with Tenants, Allison Schafferman, is now deceased.

4

Rincon, a property manager for CMA, testified that she personally performed a walk through of the unit and she agreed with the maintenance supervisor's evaluation that the carpet was blackened and stained beyond repair. She conceded that the maintenance supervisor did not endeavor to clean the carpet prior to replacement, but maintained that, based on CMA's prior experience, damage of the nature seen in the unit cannot be repaired by cleaning. Further, in her experience, when CMA cannot fix the damaged area, the entire carpet must be replaced.[9]

In closing, CMA raised three arguments: (1) Tenants did not object to the deduction in writing as statutorily required; (2) by cashing the Checks, Tenants waived their right to challenge the deductions, and; (3) the deduction was justified given the damage to the carpet.

## ANALYSIS

Residential leases within the State of Delaware are governed by Delaware's Landlord-Tenant Code (the "Code"). Section 5514 of the Code regulates the procurement, use, and disposition of security deposits.[10] Three subsections of § 5514 are relevant to the Court's analysis in this case: § 5514(c), § 5514(f) and § 5514(h).

Section 5514(c) limits the landlord's use of a tenant's security deposit. Among other things, the landlord is permitted to use a security deposit as

---

[9] Rincon did testify that there are units in the complex that can be replaced by room and not the entire carpet. However, those are deluxe units where only the bedrooms are carpeted.

[10] 25 *Del. C.* § 5514.

reimbursement for damages to the property which "exceed normal wear and tear, or which cannot be corrected by painting and ordinary cleaning."[11]

Section 5514(f) sets forth a strict series of events that must occur with regards to the return (or non-return) of a tenant's security deposit. It requires the landlord to provide the tenant with an itemized list of damages and the estimated costs of repairs, along with payment for the remaining balance (i.e., the security deposit minus the estimated repair costs).[12] If the tenant disagrees with the amount deducted for repairs, the tenant must "object *in writing* to the amount withheld by the landlord" within 10 days.[13]

Section 5514(h) dictates where the writings described in §5514(f) are to be issued.[14] It requires that the correspondence to the landlord be directed to the landlord at the address specified in the rental agreement. Similarly, any correspondence to the tenant must be sent to the tenant's forwarding address, so long as a forwarding address was timely provided.[15]

## I. Tenants' Objections Satisfied the Statutory Requirements

CMA first argues that, although Tenants asserted their Objections via e-mail within the proscribed period, such does not amount to a "writing" under the Code.

---

[11] 25 *Del. C.* § 5514(c)(1).
[12] 25 *Del. C.* § 5514(f).
[13] *Id.* (emphasis added).
[14] 25 *Del. C.* § 5514(h).
[15] *Id.*

CMA contends that the Code addresses what constitutes a "writing" in § 5113, and that Tenants failed to comply with the requirements set forth in that provision.

CMA's argument is misguided. Section 5113 does not define—or even mention—the term "writing."[16] Rather, it specifies the methods of service required for "any notice or service of process required by [the] Code."[17] Based upon a plain reading of the statute, § 5113 does not necessarily apply to *all* correspondence regarding a tenant's security deposit as described in § 5514. Importantly, § 5514 does not categorize a tenant's written objections as a "notice" or otherwise require a tenant to formally serve written objections on the landlord.[18] In fact, § 5514(h) impliedly contemplates that such correspondence may be considered a mere "communication," and that it need only be "directed" to the landlord, rather than formally served:

> (h) All *communications* and notices, including the return of any security deposit under this section, shall be *directed* to the landlord at the address specified in the rental agreement."[19]

Therefore, the question of whether Tenants satisfied their obligation to object in writing turns on (a) whether the e-mailed Objections constitute a "writing" in this context, and (b) whether the Objections were sent to an address specified in the rental agreement.

---

[16] *See* 25 *Del. C.* § 5113.
[17] *Id.*
[18] 25 *Del. C.* § 5114.
[19] 25 *Del. C.* § 5514(h)(emphasis added).

7

## A. The E-mailed Objections Constitute a "Writing"

The term "writing" is not defined in the Code, but it is a well-established precept of statutory interpretation that "undefined words in a statute must be given their ordinary, common meaning."[20] E-mail communications logically fall within the ordinary, common usage of the word "writing" as e-mails are comprised of letters conveying ideas, chronicled in an electronically visible format.[21] The same conclusion has been reached by courts in numerous jurisdictions,[22] and e-mails are specifically recognized as a writing in the Black's Law Dictionary definition of the word.[23] For these reasons, the Court finds that the Tenants' e-mailed Objections satisfy the writing requirement set forth in § 5514(f).

## B. Tenants Submission of the Objections via E-mail was Appropriate

Next, the Court must determine whether Tenants satisfied the requirements of § 5514(h) by sending the Objections "to the landlord at the address specified in the

---

[20] *Oceanport Industries, Inc, v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994)(citing *Coastal Barge Corp. v. Coastal Zone Indus. Ctrl. Bd.*, 492 A.2d 1242, 1245 (Del. 1985); *T.V. Spano Bldg. Corp. v. Dept. of Natural Resources and Environmental Control*, 628 A. 2d 53, 58 (Del. 1993).

[21] According to *Merriam-Webster's Dictionary*, a writing means "something written: such as letters or characters that serve as visible signs of ideas, words, or symbols." *Writing*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/writing (last visited May 3, 2022).

[22] *Blanchard v. N. Am. Credit Servs.*, 2016 WL 1408592, at *5 (S.D. Ill. Apr. 11, 2016) ("there is no question that electronic communications can qualify as "writings"); *Newmark & Co. Real Estate Inc. v. 2615 East 17 Street Realty LLC*, 80 A.D. 3d 476, 477 (N.Y. 1st Dept. 2011)(finding that an e-mail can constitute a writing for purposes of the statute of frauds); *Caspi v. Microsoft Network, L.L.C.*, 323 N.J. Super. 118, 125, 732 A.2d 528 (App. Div. 1999) ("[E]lectronic versus printed[,] ... in any sense that matters, there is no significant distinction").

[23] BLACK'S LAW DICTIONARY (11th ed. 2019)(defining "writing" as "any intentional recording of words in a visual form, whether in handwriting, printing, typewriting, or any other tangible form that may be viewed or heard with or without mechanical aids. This includes hard-copy documents, electronic documents on computer media, audio and videotapes, e-mails, and any other media on which words can be recorded").

rental agreement."[24] In the Lease, which was admitted into evidence at trial, two addresses are identified: one for Tenants and one for CMA.[25] However, both addresses are listed generally. Furthermore, the Lease does not contain a provision specifying an address where communications and/or notices to CMA should be sent. Lastly, it is clear from the evidence adduced at trial that CMA explicitly directed Tenants to communicate with CMA via e-mail given the COVID-19 pandemic. Therefore, the Court finds that Tenants' e-mailed Objections, which were directed to CMA at the e-mail address specified by CMA, was appropriate.

## II. Tenants' Objections Were Not Invalidated By Cashing The Checks

Second, CMA argues that Tenants' cashing of the Checks precluded their ability to challenge the deduction of damages from the security deposit. In support of its position, CMA points to § 5514(f), which provides that a tenant's acceptance of payment, along with the itemized list of damages deducted, constitutes agreement on the damages. However, CMA's interpretation overlooks the critical modulator that such rule applies "*unless* the tenant, within 10 days...objects in writing to the amount withheld by the landlord."[26] As such, Tenants' cashing of the Checks would preclude their ability to challenge the security deposit deductions *only if* they did not timely object in writing—a fact which CMA readily conceded at trial. Section

---

[24] 25 *Del. C.* §5514(h).
[25] Def. Ex. 1.
[26] 25 *Del. C.* § 5514(f)(emphasis added).

9

5514(f) is unambiguous, thus the plain meaning of the words chosen by the legislature control;[27] the Court will not assume that the legislature's use of the word "unless" was superfluous.[28] Accordingly, the Court finds that Tenants did not waive their right to challenge the security deposit deductions.

## III. The Damage to the Carpet Exceeded Normal Wear and Tear

Finally, having found no procedural deficiencies with regards to the Objections, the Court must consider whether CMA was statutorily authorized to apply the security deposit to cover the expense of replacing the carpet. Specifically, the Court must determine whether the damage to the carpet was beyond normal wear and tear or could not be corrected by ordinary cleaning.[29]

CMA testified that it installed the carpet in the Tenants' unit just prior to the Tenants' occupancy, making the carpet approximately two years old. The Court notes that while both parties testified about different areas of the carpet, the primary area at issue was located in the hallway. Both parties introduced photographs of the relevant areas of carpet, which revealed distinct areas of discoloration.[30] Tenants conceded that: the area was subject to foot traffic on a daily basis, as it was used to enter and exit the unit; their guests would walk on the carpet without removing their

---

27 *Sussex County Dept. of Elections v. Sussex County Republican Committee*, 58 A.3d 418, 422 (Del. 2013); *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 539-540 (Del. 2011).
28 *Oceanport Industries, Inc.*, 636 A.2d 892, 900 (Del. 1994); *Coredero v. Gulfstream Development Corp.*, 56 A.3d. 1030, 1035-1036 (Del. 2012).
29 25 *Del. C.* § 5514(c)(1); *BRG, LLC v. Brinsfield*, 2010 WL 1413004, at *2 (Del. Com. Pl. Mar. 4, 2010).
30 Pl. Ex. 1; Def. Ex. 3.

shoes; and they did not wipe off their dog's paws prior to entering the carpeted hallway. Further, the Court finds credible CMA's testimony that, in its considerable experience, the extent of the damage to the carpet was beyond normal wear, and the nature of the damage would render any cleaning efforts futile. Specifically, CMA offered evidence establishing that the decision to replace the carpet, rather than attempting to restore its condition by professional shampooing, was attributable to the inspection and evaluation of the carpet performed by the maintenance supervisor, who has 30 years of experience.

Based on the above noted evidence, the Court finds that the damage to the carpet was beyond normal wear and tear. Therefore, CMA's use of the security deposit to cover costs for replacement of the carpet was appropriate under the Code.

## CONCLUSION

For these reasons, the Court finds that CMA was entitled to apply the security deposit to the damages to the carpet caused by Tenants. Therefore, judgment is entered in favor of CMA. Each party shall bear its own costs.

**IT IS SO ORDERED.**

_____
Monica A. Horton
Judge


cc:     Pat Thomas, Judicial Case Manager

11